UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JASON HACKER,

Plaintiff,

CIVIL ACTION

No. 3:14-00063-JWD-EWD

VERSUS

N. BURL CAIN *ET AL.*,

Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## II.    INTRODUCTION

Before the Court are dueling dispositive motions, with each party seeking judgement in its favor pursuant to Federal Rule of Civil Procedure 56.[1] Mr. Jason Hacker ("Hacker" or "Plaintiff") has filed the Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ"). (Doc. 148.) To this filing, six natural and artificial persons—the former warden of Louisiana State Penitentiary, Mr. N. Burl Cain ("Former Warden" or "Cain"); Louisiana State Penitentiary itself

---

[1] In this memorandum, any and all reference to "Rules" or "Rule []" are to the Federal Rules of Civil Procedure unless otherwise noted.

("LSP" or "Angola"); the State of Louisiana ("Louisiana" or "State"); the Louisiana Department of Public Safety and Corrections ("LDPSC"); the former governor of Louisiana, the Honorable Bobby Jindal ("Jindal"); and the Secretary of LDPSC, Mr. James M. LeBlanc ("LeBlanc" or "Secretary") (collectively, "Defendants")—have responded with Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Opposition"). (Doc. 151.) In response, Hacker has defended his motion with the Plaintiff's Reply to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Reply"). (Doc. 155.) Prior to the docketing of Plaintiff's MSJ, Defendants filed the Defendants' Motion for Summary Judgment ("Defendants' MSJ"), (Doc. 122), to which Plaintiff has responded with Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition"), (Doc. 130), with thousands of pages of supporting exhibits docketed separately, (Docs. 126–28). In these varied motions (collectively, "Motions"), each party insists that no reasonable jury could disagree that the uncontested facts favor his or its victory as to every claim or defense asserted pursuant to controlling constitutional and statutory law, including the Eighth Amendment of the United States Constitution; the Americans with Disabilities Act of 1990, as amended in 2008 ("ADA"); Section 504[2] of the Rehabilitation Act of 1973[3] ("RA"); the Prison Litigation Reform Act ("PLRA"); and Section 1983 of the Forty-

---

[2] In this memorandum, any and all references to "Section 507" or "§ 507" are to this section of the RA unless otherwise noted.

[3] Although the RA predates the ADA by twenty-one (21) years, it codified a definition of disability later adopted by the ADA. Consequently, courts mine the same body of law in construing these related statutes. *See infra* note 10; *see also, e.g.*, *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997) ("The Rehabilitation Act is materially identical to and the model for the ADA . . . except that it is limited to programs that receive federal financial assistance[.]"); *cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252–55 (2012) (explaining the relevant related-statutes canon). For this reason, throughout this opinion, the Court will refer to Plaintiff's disability claims as arising under the

Second Title of the United States Code.[4] Despite this seeming complexity, once these sprawling motions are distilled to their bare essentials, four questions must be asked, their answers leaving no doubt about their required resolution under Rule 56.

The answers to the first two compel denial of Defendants' MSJ. First, have Defendants shown that no genuine dispute exists as to the propriety of Plaintiff's medical treatment, the facts incontestably demonstrating that he never endured medical indifference of such extent and incontrovertibility as to offend the Eighth Amendment? Second, have they demonstrated a similarly indisputable absence of reasonably construed evidence demonstrating that Plaintiff suffered disability discrimination in contravention of the ADA/RA? The answer to both questions is "no." Considered in toto, the existing record does not establish the certain impossibility of a jury reaching a reasonable verdict as these issues and in Plaintiff's favor. Thus, Defendants' MSJ must be denied.

Just as clearly, subject to the same limits imposed by Rule 56, the necessary answers to the second two questions lead to the defeat of Plaintiff's MSJ. First, has Plaintiff provided incontrovertible proof compelling a favorable judgment on his Eighth Amendment claim, proof that no jury could reject and which no doubt infects? Second, has Plaintiff also offered up indisputable proof of the kind of discrimination barred by the RA/ADA so that judgment in his favor must now be ordered by this Court, no fair dispute as to this fact even remotely possible? The answer to both questions is "no," as the record can be reasonably, if barely, construed in Defendants' favor. Therefore, Plaintiff's MSJ must fail.

For these reasons, as discussed in more detail below, the Plaintiff's Motion for Summary

---

"RA/ADA" or "ADA/RA," these two statutes' technical distinctions irrelevant to this ruling's legal analysis.

[4] In this opinion, any and all reference to "Section 1983" or "§ 1983" are to this oft-used statute.

Judgment, (Doc. 148), and the Defendants' Motion for Summary Judgment, (Doc. 122), must both be rejected, the factual issues too many and too crucial for anyone but a jury to make the necessary calls.


## III.     FACTUAL BACKGROUND

### A.     Facts Summarized in First Complaint[5]

Plaintiff filed his first complaint on January 30, 2014. (Doc. 1.) It lists several different persons as Defendants: Louisiana; LDPSC; LSP; Jindal, Cain, and LeBlanc, in both their official and individual capacities; Dr. Rahm Singh, LSP's medical director; and Ms. Stephanie Lamartiniere, LSP's assistant warden. (*Id.*) The latter two persons disappeared from Plaintiff's first amended complaint, (Doc. 19 at 1), having been terminated on September 15, 2014, by Plaintiff's filing of this pleading, (*Id.*), and thereby rendering at least part of Defendants' MSJ irrelevant, (*See* Doc. 122-2 at 13–14).

In this first attempt, Plaintiff characterized his central claim as the unreasonable and unjustifiable denial of "adequate medical care," averring "that the Defendants have been deliberately indifferent to his serious medical needs[,] resulting in unnecessary pain and suffering and loss of sight in violation of the Eighth Amendment." (Doc. 1 at 4.) As the PLRA commands, Plaintiff had formally tendered "Request for Administrative Remedy" ("ARP") as a result of these "systemic deficiencies and deliberate indifference to his serious medical needs." (*Id.* at 11.) This request was denied at the first and second steps, this second denial exhausting his remedies and triggering his right to sue in federal court. (*Id.*)

---

[5] Because the factual allegations in this first complaint are expanded upon in the operative pleading, they are summarized here. More detail emerges, but the factual allegations made here are never deleted.

During his incarceration, Plaintiff's eyesight noticeably worsened. After four trips to an outside eye specialist at the Pennington Biomedical Research Center at Louisiana State University ("LSU"), an unnamed doctor diagnosed him with "severe cataracts in both eyes." (*Id.* at 11.) Subsequently, he visited one more eye specialist at LSP. (*Id.* at 12.) At that time, he complained "that he could not see and that his right eye was failing at what seemed like an even greater rate [than] when first seen." (*Id.*) Afterward, pursuant to this second physician's recommendations and with the LSP's facilitation, Plaintiff met an eye specialist at the Charity Hospital in New Orleans. (*Id.*) During this visit, Plaintiff maintains, "th[is] specialist assured Plaintiff that he would inform the Medical Director at LSP of his need for 'immediate cataract surgery in both eyes.'" (*Id.*) According to Plaintiff's account, he added "that he would include the fact that Plaintiff's cataract condition was the reason for him going blind and that surgery would 'correct and restore' his vision." (*Id.*) During these numerous visits, not one specialist failed to note Plaintiff's increasingly poor eyesight and his "need" for surgery, but not one described cataracts removal surgery as either purely "elective" or as medically and immediately imperative as that ambiguous classification has been delineated by LSP and LDPSC. (*See also* Doc. 148-1 at 23–26; Doc. 151 at 9 n.2.)

Meanwhile, Plaintiff's life continued mostly unchanged in spite of this diagnosed physical deterioration. On or about May 6, 2013, while assigned to "a field line," Plaintiff was ordered to perform "regular duty." (*Id.*) At that point, Plaintiff "declared himself a medical emergency" and "explained to the EMT that he could only see six to eight feet in his left eye, and that he practically had no sight in his right eye." (*Id.*) Allegedly, he also "explained to the [same] EMT that, as he understood the [third] specialist, he was supposed to receive eye surgery." (*Id.*) During that same colloquy, Plaintiff "complained that, after his visit with the eye specialist, he

was not issued a duty status for his medical condition." (*Id.*) On May 16, 2013, Plaintiff "again declared himself a medical emergency," specifically complaining of "pain and burning in his eyes, his inability to see, and his inability to perform his work detail as would someone without a disability." (*Id.* at 12–13.) As a result of these physical complaints, implicitly, albeit temporarily, credited by prison officials, Plaintiff again received "a three day duty status." (*Id.* at 13.) Again "informed that his concern would be referred," Plaintiff wondered, "[f]or the second time," why his failing eye sight had not yet resulted in his receipt of "standard duty status." (*Id.*)

In June of 2013, an LSP doctor finally saw Plaintiff. (*Id.*) This doctor allegedly determined Plaintiff to have become "legally blind" rather "quickly." (*Id.*) Unfortunately (and purportedly), he simultaneously informed Plaintiff that no surgery would be scheduled due to a dearth of funds. (*Id.*) This specialist apparently blamed "the LSP Medical Director," who had once said "that the only way . . . [Plaintiff] would receive . . . eye surgery is if he was 'bleeding from the eyes' or if it was a life or death situation." (*Id.*) It did not matter that "without the needed surgery . . . [Plainitff's] medical condition would worsen and result in a lifelong handicap with permanent loss of sight." (*Id.*) A similar conversation occurred when Plaintiff visited an LSP eye doctor in August 2013. (*Id.*) His state, though purportedly dire, "was not a life or death situation" for which funds, presently unavailable, would be spent to correct. (*Id.*) Policy, not necessarily a doctor's objective medical opinion, lay behind this decision, so Plaintiff then said and still claims. (*Id.*)

Due to these "intentional inordinate delays, and [Defendants'] knowing denial of needed medical care," Plaintiff suffered "continued pain, both physical and mental." (*Id.*) He, in fact, bore a grievous and confirmable physical deterioration: legal blindness, a condition evidenced by the medical documents created and maintained by LSP and its appointed doctors. (*Id.*) In this

first complaint, his denial of medical care "based upon cost/lack of funds" was described as a violation of the Eighth Amendment because Defendants were "deliberate[ly] indifferen[t] to his serious medical needs." (*Id.* at 14.) No other law, including the ADA and RA, appears in this first pleading.

**B.     Story Expanded: The Amended Complaint**

Plaintiff filed the operative complaint ("Amended Complaint") on June 2, 2015. (Doc. 73.)

The Amended Complaint initially supplements and corrects Plaintiff's timeline. According to this filing, "[o]n June 24, 2012, Interim LSU Hospital Personnel recommended . . . [Plaintiff] receive cataract surgery and that a special follow-up is needed for cataract surgery," a need for which Defendants were allegedly informed. (*Id.* at 4.) In the fall of 2012, Plaintiff was seen at the Earl K. Long Eye Clinic. (*Id.*) During this visit, he was diagnosed with cataracts; "[u]pon his return [to Angola], [D]efendants were notified that Mr. Hacker should be referred to Interim LSU Hospital for cataract removal surgery." (*Id.*) In January 2013, a doctor in Angola saw Plaintiff for his rapidly declining eye sight and "scheduled Mr. Hacker to see an eye specialist outside Angola." (*Id.* at 5.) In April 2013, "cataract extraction surgery" was recommended once "approved by the 'prison board.'" (*Id.*) Despite this qualifier, Plaintiff described this recommendation as one for "immediate cataracts surgery in both eyes" and as deeming surgery "medically necessary." (*Id.*) As he had previously contended, on May 6 and 13, 2013, Defendants did no more than "provide[] [P]laintiff[] with a three-day duty status" but did not "issue[] a permanent duty status" or schedule him for cataracts surgery. (*Id.* at 6–7.) Though a prison doctor would indicate that Plaintiff "needed a duty status consisting of[] 'sit to work, out

of field, no sports, no hobbycraft, no rodeo and no kitchen'" in late May 2013, Defendants ignored these directions. (*Id.* at 7.) Indeed, in July 2013, Plaintiff was still being forced to work in the fields, no surgery yet scheduled, though he was deemed "legally blind" by Angola personnel. (*Id.*) Oddly, Plaintiff "was given a temporary duty status that entailed the following: 'Regular duty with restrictions . . .'" but his duty status "reverted back" to its original state after three days. (*Id.*)

In the fall of 2013, he again temporarily received a modified duty status consistent with his doctors' recommendations. (*Id.* at 7–8.) In effect, Defendants' denial of surgery in this case, as in so many others, was "not based on sound medical science" nor "made on an individualized basis according to the particular medical condition of a specific prisoner." (*Id.* at 10.) Eventually, in the summer and fall of 2014 and roughly one month after Plaintiff obtained private counsel, Plaintiff did receive surgery on his right and left eyes. (*Id.* at 9; *see also, e.g.*, Doc. 155 at 3–4.)

In two paragraphs, the Amended Complaint contains explicit statements regarding the extent to which his untreated cataracts engendered Plaintiff's physical suffering. As he awaited surgery, Plaintiff allegedly endured "severe pain" in both eyes. (*Id.* at 6.) He had "blurred vision" and "trouble seeing far away." (*Id.*) On at least one occasion, Plaintiff was injured in the field as a result of his deficient sight. (*Id.*) As he tells it, when "a hay bail was thrown in his direction," he "could not ascertain the distance of the bail, its direction of travel, nor its location when he tried to catch it." (*Id.*) "[H]aving failed to catch it correctly, he tore his right pectoralis muscle." (*Id.*) In contrast, the first complaint had avoided such precision, though it too alleged the existence of "continued pain, both physical and mental." (Doc. 1 at 13.)

Significantly, the Amended Complaint adds a second basis for relief. Plaintiff, of course, repeats his Eighth Amendment claim, accusing Defendants of being "deliberately indifferent to .

. . [his] serious medical needs by refusing to pay for eye surgery for a reasonable amount of time

after doctors recommended eye surgery for his cataracts" and despite knowing of his cataracts

"and its devastating effect on his eye sight." (*Id.* at 12.) Plaintiff now goes further, however, by

contending that Defendants discriminated against him, a qualified individual with a disability, in

violation of the ADA and RA. (*Id.* at 11.) The specific ADA and RA violations alleged are

Defendants' refusal to provide Plaintiff with cataracts extraction surgery and exclusion of

Plaintiff "from participation in or denial of the benefits of the prison's services, programs, or

activities" by virtue of their failure to accommodate his specialized needs. (*Id.* at 11–12.)


C.      **Contested Timeline and Extant Policy**

To an extent, based on both Parties' filings, a timeline can be fashioned. (*See, e.g.*, Doc.

148-1; Doc. 151-1.) Thus, the dates of doctors' visits can be confirmed, but the precise import of

every diagnosis remains contested. (*See, e.g.*, Doc. 148-1; Doc. 151-1.) Simply put, the Parties

continue to dispute the extent to which the medical record made it patently clear that cataract

removal surgery was so essential that its delay bordered on and eventually demonstrated

Defendants' indifference.

In contrast, the language of two general policies is not in question. Per LDPSC's Health

Care Policy No. HC-16, dated August 27, 2010, a "medically necessary procedure" is defined as

"[t]reatments/procedures routinely prescribed by health care providers to maintain/preserve basic

health and/or functionality." (Doc. 126-7 (Ex. G) ¶ 3D, at 1.) It further defines an "[e]lective

procedure" as "[a]ny planned" and "non-emergency procedure"; though so deemed, "[tha]t may

be either medically necessary (e.g., cataract surgery, routinely scheduled heart surgery, etc.) or

optional (e.g., cosmetic, etc.)." (*Id.* ¶ 3A, at 1.) LSP's Directive Number 13.030 uses the same

definitions: an elective procedure can be "medically necessary" or "optional" yet still be "non-emergency" and even "planned." (Doc. 126-6 (Ex. E), at 1.)

### D.      Defendants' MSJ: Arguments and Counterarguments

### 1.      *Immunities*

Defendants' MSJ begins with three common immunity arguments. First, Defendants argue that Cain, LeBlanc, and Jindal are not liable under Section 1983 for monetary damages, as a state is not a person for purposes of Section 1983, nor are state officials acting in their official capacities. (Doc. 122-2 at 7.) In particular, Defendants insist the Plaintiff has failed to allege any personal act by Cain, LeBlanc, and Jindal that violated his constitutional rights. (*Id.*) This failure is fatal since, argue these Defendants, to be liable under Section 1983 either a defendant must be personally involved in the act depriving the constitutional right or Paintiff must show a causal connection between any one of his or her acts and the constitutional violation to be redressed. (*Id.*)  Since the acts of the employees and subordinates of the Defendants cannot be imputed to these three Defendants, they are immune. (*Id.* at 9–12)

Second, every natural Defendant claims that he is entitled to qualified immunity, insisting the Plaintiff has failed to satisfy the first prong of the requisite two prong test. (*Id.* at 8.) As the Defendant's MSJ explains, "Plaintiff has failed to state a claim for a violation of a right secured to him under the United States constitution" and "makes no specific allegations of any personal act by these defendants that violated his constitutional rights." (*Id.*) Third, Defendants argue that Louisiana, LSP, and LDPSC are protected by sovereign immunity absent consent by the state or congressional action abrogating such immunity. (*Id.* at 29.)

The Plaintiff attacks the bases for these supposed immunities. First, he emphasizes that the theory under which he commenced his suit as to Cain, Jindal, and LeBlanc is the doctrine of liability allowed in *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). (Doc. 130 at 5–6.) As this doctrine requires, *see infra* Part IV.A.3, Plaintiff contends that Defendants have a policy of delaying medically necessary "elective surgery" that has been followed for years (*Id*.) The Plaintiff insists he will be able to show a pattern of these delays and that the Defendants have failed to show that Plaintiff is alleging only a "single wrongful act," thereby triggering this form of liability. (*Id.* at 6–7.)

In making this argument the Plaintiff sets forth the following evidence: a policy that defines certain "medically necessary" surgeries as "elective," one followed by LSP and LDPSC; medical records of six other inmates who have been referred for cataract surgery but not yet received it, three others who are still waiting for surgical referrals, and one more who obtained essential surgery only after an extensive delay; and a string of cases evidencing, on the basis of analogous facts, that a policy of delaying medically-needed surgery could be seen as deliberately indifferent to an inmate's serious medical needs by a reasonable group of empaneled citizens. (*Id*. at 6–9.) Even apart from this invocation of *Monell*, Plaintiff denies that Jindal, Cain, and LeBlanc are entitled to qualified immunity. (*Id.* at 35.) In his view, neither prong of the pertinent test favors these three Defendants, as his constitutional right to barely adequate medical care was well-established when surgery was first recommended on June 24, 2012. (*Id.*) Third, Plaintiff argues the immunity has been waived for purposes of the RA/ADA since the other Defendants— Louisiana, LSP, and LDPSC—receive federal funds. (*See* Doc. 130 at 16.)

2.      *Eighth Amendment*

Thereafter, Defendants contend no evidence shows that any single one of them was deliberately indifferent to Plaintiff's obvious and established medical needs. (Doc. 122-2 at 16–18.)  Pointing out that Plaintiff was under constant medical supervision, as evidenced by his own medical records, Defendants maintain that Plaintiff's minimal medical needs were not ignored. (*Id*. at 18–21.) Consequently, while Plaintiff has alleged he suffered unconstitutional indifference, "the evidence is overwhelming to the contrary." (*Id.* at 16.)

Plaintiff responds that a reasonable jury could find the Defendant's actions constitute an Eighth Amendment violation. (Doc. 130 at 9.) Plaintiff points out that courts have repeatedly found that delaying surgery for medical procedures deemed "elective" as a matter of policy can constitute unconstitutionally deliberate indifference. (*Id*. at 10.) Certainly, making Hacker "wait[] 813 days for surgery to be completed, despite doctors insisting that he need surgery 'as soon as possible,'" facts supported by the existing record, could be enough to convince a reasonable jury to find Defendants' policy in general and delay as to Plaintiff in particular constituted the kind of deliberate medical indifference plainly forbidden by the Eighth Amendment. (*Id*. at 11.) Additional support for such a conclusion could be found in one more uncontested fact: LSP required Hacker to do field work, though he was legally blind according to its black-letter files, a decision that could not only be regarded as a danger to his health. (*Id*.) Indeed, Plaintiff was arguably injured during the field-work due in part to his poor vision. (*Id*.; *see also, e.g.*, Doc. 148-1 at 30–33.)

3.      *RA/ADA*

Defendants' attack begins with the PLRA's exhaustion requirement,[6] arguing that

Plaintiff failed to exhaust administrative remedies as to his RA/ADA claim. (Doc. 122 at 21.)

Indeed, they contend that no record exists indicating that Hacker gave notice to any of the

Defendants regarding the allegations contained in his ARP, which bears the designation "LSP -

2013-2554," regarding this particular claim. (*Id.* at 27.) Since the ARP process is mandatory and

access to inmate counsel is available for assistance in completing the process, Plaintiff's failure

cannot be excused. (*Id*. at 27–28.) Indeed, while the Amended Complaint included these new

RA/ADA allegations, it made no mention of exhaustion. (*Id*. at 28.) Defendants conclude the

MSJ by arguing that "[t]he court should dismiss the [P]laintiff's silent claim on ADA based on

his failure to plead the exhaustion of his ADA claim in his administrative remedies." (*Id.*)

The Plaintiff counters that Defendants have read the PLRA's exhaustion standard too

expansively. (Doc. 130 at 12.) Under controlling precedent, Hacker did not need to name all

defendants in a subsequent suit to properly exhaust his remedies under PLRA. (*Id.*) Furthermore,

any failure to mention the RA/ADA is irrelevant since a grievance must do no more than alert

prison officials to a problem and provide the opportunity to address it; no more and no less is

mandated. (*Id*. at 13.) To summarize, Plaintiff maintains that the PLRA contains no requirement

that an inmate list every person involved, make explicit reference to a statute like the ADA, or

invoke legal words like "disability" or "accommodation," and its exhaustion criterion will be

fulfilled if an inmate complies with a prison's own grievance procedure. (*Id*. at 12–13.) By

laying out all the pertinent facts, their cumulative weight leaving no question about the colorable

---

[6] Even though Defendants initially lodge the exhaustion argument against Plaintiff's RA/ADA
and Eighth Amendment claims, (Doc. 122-2 at 27), their counsel later narrowed this defense to
the RA/ADA alone, (Doc. 151 at 2–3).

existence of an ADA claim, the Plaintiff satisfied the law's minimum. (*Id*. at 13–14.) Indeed, since Defendants' grievance procedure "requires only that . . . [a] prisoner write a letter to the Warden, in which he briefly sets out the basis for his claim, and the relief sought" and as Plaintiff wrote about his "impending blindness," his inability "to perform daily living activities," and his need for surgery, his ARP was "more than sufficient to fulfill Defendant's"—and the PLRA's— "exhaustion requirements." (*Id.* at 14.)

Defendants' MSJ next focuses upon the substantive merits of Plaintiff's RA/ADA claims. Broadly, Defendants argue that no records exist showing either a request for accommodation by Hacker or a denial of his request. (Doc. 122-2 at 28.) Defendants insist an inmate may seek formal review of a complaint regarding his or her request for reasonable accommodation and make this request in writing or orally. (*Id*.) Further, Defendants contend that a variety of accommodations exist for blind inmates at LSP, ones that Plaintiff never requested. (*Id.* at 29.) Yet, Plaintiff never did make a formal request for any one of these accommodations or articulate a request for any reasonable adjustment of his duties and status (but surgery), as attested by LSP's ADA coordinator, Deputy Warden Richard Lee Peabody ("Peabody"). (*Id.* at 28.) In other words, Plaintiff himself failed to document his attempts to obtain the modifications purportedly essential for his well-being. (*See id.*)

The Plaintiff counters that a request for accommodation does not require any particular manner and can be verbal or written. (Doc. 130 at 14.)  Moreover, it is simply not necessary for an inmate to mention the ADA or use the phrase "reasonable accommodation." (*Id*. at 15.) Plaintiff insists his request for an accommodation could be inferred from his ARP, in which he explicitly mentioned his "inability to perform [his] work detail as would someone without a disability" and described his diagnosed cataracts as leaving him "unable to perform daily

activities." (*Id.*) It even referenced inaction's danger—"denial of the needed surgery will result in a lifelong handicap"—and requested "a specific accommodation—that he be 'scheduled for cataracts surgery without further delay.'" (*Id.*)

### E.     Plaintiff's MSJ: Arguments and Counterarguments

Plaintiff begins with the RA/ADA, arguing that no reasonable jury could find that the Defendants accommodated the Plaintiff's disability. (Doc. 148-1 at 9.) According to LSP's own records, Hacker had become legally blind, and the need for some accommodation for this disability was so obvious that the Defendants should have adjusted his work schedule without need for Plaintiff to so request. (*Id.* at 10) Even so, Plaintiff contends that multiple verbal and written requests were actually made. (*Id.* at 13.) Furthermore, the Plaintiff argues that the Defendants did not engage in the interactive process mandated by the ADA, as Defendants have purportedly admitted. (*Id.* at 13–14.)

Plaintiff also argues that certain Defendants have failed to follow their own ADA procedures to his detriment by, for example, not relaying his medical diagnosis to LSP's ADA coordinator. (*Id.* at 19–20.) As further support, the Plaintiff relies on Defendants' alleged history of discrimination against persons with disabilities, a history sufficient to establish discriminatory intent under Rule 56. (*Id.* at 14–16.) Indeed, by Plaintiff's reckoning, until 2014 the Defendants had not responded to any blind inmate's requests for reasonable accommodation. (*Id.* at 16.)

The Defendants counter that the Plaintiff's RA/ADA claims do not entitle him to victory under Rule 56, giving three familiar reasons. (Doc. 151 at 2.) Once more, Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to filing suit. (*Id.*) Once more, Defendants insist that Plaintiff's original request for an accommodation focused solely on his

underlying medical condition and that he only requested surgery. (*Id*. at 5.) Once more, the Defendants argue that Plaintiff cannot show how he (or any other inmate) was discriminated against due to his disability. (*Id*.)

Plaintiff's final arguments center on his medical indifference claim, from which he urges two separate constitutional claims. First, Plaintiff maintains that the Defendants violated the Eighth Amendment when they neglected his surgical need, eventually resulting in his temporary blindness, in accordance with a general department policy. (Doc. 148-1 at 20.) The Plaintiff insists an Eighth Amendment violation for delaying medical care occurred due to: (1) his serious need for surgery so as to avoid going blind from untreated cataracts; (2) Defendants' knowledge of, and deliberate indifference to, his need; and (3) the substantial harm that resulted from Defendants' indifference. (*Id*. at 21.) Plaintiff contends the Defendants' own doctors conceded he had a serious medical need when they describe him going blind as "a serious medical problem." (*Id*. at 22.) Plaintiff insists that Defendants were deliberately indifferent since they knew about the serious medical need because of the various medical records and doctor visits that show his medical condition.  (*Id*. at 21, 23.)

Relatedly, the Plaintiff argues that a violation of the Eighth Amendment occurred when he was forced to conduct dangerous work in Angola's field since he was visually-impaired. (Doc. 148-1 at 30.) Plaintiff maintains that all three elements of proving a work-assignment violation of the Eighth Amendment are met: (1) defendant acted with knowledge of, and deliberate indifference to plaintiff's condition; (2) plaintiff's medical condition was serious one; and (3) type of work assigned worsened the medical condition. (*Id*. at 31.) Plaintiff insists these elements were met since the Defendants had "extensive knowledge" of the vision problems and his work schedule eventually resulted in his sustaining actual injuries. (*Id*. at 32.) Finally, the

Plaintiff argues he has established that his denial of medical care was part of an official pattern of delaying elective surgery, a custom or policy sufficiently widespread to trigger liability under *Monell* as to every Defendant. (Doc. 148-1 at 34.) In support of this contention, Plaintiff points to seventeen cases at LSP where inmates are still waiting for surgeries. (*Id.*)

In counter, Defendants insist that Plaintiff cannot establish a prima facie case for the alleged medical indifference under the Eighth Amendment. (Doc. 151 at 7.) To them, the constant medical care, treatment, medication, and surgeries that LSP provided to Plaintiff prevent him from meeting the "extremely high" burden of establishing constitutionally verboten medical indifference. (*Id.* at 9.) His condition was treated, although perhaps not perfectly or to his satisfaction; hence, he cannot succeed in this tightly cabined cause of action. (*Id.*; *accord* Doc. 122-2 at 16.)

## IV.    DISCUSSION

## A.    Relevant Legal Standards

### 1.    *Procedural Law: Rule 56*

Under Rule 56(a), summary judgment is generally appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Axiomatically, a court construes all facts and

evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586,

591 (5th Cir. 2013). In response to another's motion, the nonmovant cannot rely on

"[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments,"

none "an adequate substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v.*

*Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). Still, "[w]hen both parties have

submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536,

540 (5th Cir. 2005), a court is bound to "draw all reasonable inferences in favor of the

nonmoving party" and cannot "make credibility determinations or weigh the evidence," *Reeves*

*v. Sanderson Plumping Prods.,* 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105

(2000); *see also Anderson*, 477 U.S. at 248 (emphasizing the irrelevance of "[a]ny proof or

evidentiary requirements imposed by the substantive law," materiality "not a criterion for

evaluating the evidentiary underpinning of [factual disputes]").

      Thus, "the court should give credence to the evidence favoring the nonmovant as well as

that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the

extent that that evidence comes from disinterested witnesses." 9A C. WRIGHT & A. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995). In other words, "although the court

should review the record as a whole, it must disregard all evidence favorable to the moving party

that the jury is not required to believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at

591. If more than a scintilla of evidence is assembled, "[t]he court must resolve factual

controversies in favor of the nonmoving party." *White v. Gov't Emps. Ins. Co.*, 457 F. App'x

374, 377 (5th Cir. 2012). Under Rule 56, summary judgment is hence inappropriate (1) if there

are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the

case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the

nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts,"

"conclusory allegations," "unsubstantiated" or "bare assertions," or "a scintilla of evidence,"

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538

(1986); *Hopper v. Frank*, 16 F.3d 92, 94 (5th Cir. 1994); and *Davis v. Chevron U.S.A., Inc.*, 14

F.3d 1082, 1086 (5th Cir. 1994)). An alleged "lack of evidence to support the non-moving

party's case" can hence be countered by "[s]pecific evidence in the record," such tailored

opposition foreclosing summary judgment. *Jobe v. ATR Mktg., Inc.*, No. 98-31366, 1999 U.S.

App. LEXIS 40209, at *8–9, 1999 WL 511380, at *3 (5th Cir. June 23, 1999) (citing *Duffy v.*

*Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995), and *ContiCommodity Servs., Inc. v.*

*Ragan*, 63 F.3d 438, 441 (5th Cir. 1995)).

  As explained more fully below, *see infra* Part III.A.2–3, two principles derived from the

governing substantive law indirectly affect how Rule 56 plays out in discrimination and medical

indifferences cases. For purposes of the RA/ADA, "a fact-specific, case-by-case inquiry that

considers, among other factors, the effectiveness of . . . [a possible] modification in light of the

nature of the disability in question" is invariably required. *Staron v. McDonald's Corp.*, 51 F.3d

353, 356 (2d Cir. 1995); *cf., e.g.*, *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1032 (8th Cir.

2005) (employment discrimination under the ADA). As another appellate court said, an ADA or

RA case frequently rides upon "resolution of . . . complicated, fact-intensive inquiries." *R.K. v.*

*Bd. of Educ.*, 494 F. App'x 589, 597 (6th Cir. 2012). Similarly, deliberate indifference is often

described as a "fact-intensive inquir[y]," *Garrett v. Thaler*, 560 F. App'x 375, 379 n.3 (5th Cir.

2014), a logical consequence of this doctrine's use of objective and subjective elements, *see*

*Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994); *see also infra* Part III.A.2.

**2.      *Substantive Law: Eighth Amendment***

To state a claim under Section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). In *Estelle v. Gamble*, the Court held that "deliberate indifference to serious medical needs of prisoners" constituted the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment, wholly actionable under Section 1983. 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). However, as Defendants correctly point out, "an inadvertent failure to provide adequate medical care" does not amount to a constitutional violation; "[m]edical malpractice," if predicated on pure negligence, "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also, e.g.*, *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991) (quoting *Estelle*, 429 U.S. at 106); *Rodrigue v. Grayson*, 557 F. App'x 341, 344 (5th Cir. 2014) (same). Instead, the operative test requires deliberate indifference on the part of the prison officials, a subjective prong, and that the prisoner's medical needs be serious, an objective prong. *Monmouth Cnty. Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir. 1987).

Per this standard, if "a prisoner allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" by, for example, showing that "prison guards . . . intentionally den[ied] or delay[ed] access to medical care," he or she has indeed stated

a cognizable claim under Section 1983. *Estelle*, 429 U.S. at 105, 106; *see also Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). True, "evidence which shows only that an inmate disagrees with a diagnosis or the course of treatment selected for him is [inherently] not sufficient." *Little v. Lycoming Cnty.*, 912 F. Supp. 809, 816 (M.D. Pa. 1996) (quoting *Estelle*, 429 U.S. at 105–06). Conversely (and logically), evidence that prison officials provided no treatment despite their own medical staff's diagnosis or professional judgment may be sufficient, depending on the nature and strength of the evidence. As the Fifth Circuit has further explained, refusing to "treat" a prisoner, "ignoring his complaints," "intentionally treat[ing] him incorrectly, or engag[ing] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" trigger such liability. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown. *See, e.g., Lanzaro,* 834 F.2d at 346 ("Where prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to 'undue suffering or the threat of tangible residual injury' . . . deliberate indifference is manifest." (internal citations omitted)); *Ancata v. Prison Health Servs.,* 769 F.2d 700, 704 (11th Cir. 1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference."). In recent months, this Court has applied this same standard. *See, e.g.*, *Donahue v. Wilder*, No. 15-cv-499-JWD-RLB, 2016 U.S. Dist. LEXIS 15984, at *12–15, 2016 WL 552588, at *4–5 (M.D. La. Feb. 10, 2015).

In undertaking such complex analyses, courts have focused on five questions:

- How serious was the prisoner's need for medical attention?

- Has the alleged medical need been confirmed by a health care professional?

- Did the prisoner request any medical treatment and, if so, did he or she receive treatment that addressed his need?

- Was the treatment rendered adequate?

- If the prisoner did not receive any treatment or only inadequate treatment, what was the subjective motivation of the responsible prison official for denying or delaying medical treatment?

Damon Martin, Comment, *State Prisoners' Rights to Medical Treatment: Merely Elusive or Wholly Illusory?*, 8 Black L.J. 427, 433 (1983). As these questions suggest, "[a] claim against prison officials and/or prison medical professionals for failure to provide medical care is 'fact-intensive and . . . require[s] . . . development of the record' and a 'conclusory assessment essentially disregards [a] [plaintiff's] allegations.'" *Randolph v. Wetzel*, 987 F. Supp. 2d 605, 624 (E.D. Pa. 2013) (alterations in original) (quoting *Leamer v. Fauver*, 288 F.3d 532, 547 (3d Cir. 2002)). This concern reflects the doctrine's common understanding. As one court explained, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his[, her, or its] action." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir. 2015). As another explained, the Eighth Amendment is only offended when a serious medical need and exists and the relevant officials are both "aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and . . . [actually] draw the inference." *Barnett v. Luttrell*, 414 F. App'x 784, 787–88 (6th Cir. 2011).

### 3.   *Substantive Law: Monell Liability*

Named after the famed case that first recognized it, *Monell*, 436 U.S. at 694, *Monell*

liability requires proof of four elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation;[7] and (4) a violation of that constitutional right whose "moving force" is "the policy or custom," *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (construing (3) and (4) as one element). Stated differently, "[a] plaintiff must point to a persistent and widespread practice[] of municipal [or state] officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference"; as such, knowledge and indifference, factors incorporating subjective and objective components, are required, as is an actual threshold constitutional violation. *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402–03 (4th Cir. 2014); *see also, e.g.*, *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (internal quotation marks omitted)); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (enumerating the pertinent elements).

   *Monell* "presupposes a conscious adoption of a course of action 'from among various alternatives,'" *Shadrick*, 805 F.3d at 752, and the practice that it and its progeny forbid must be "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with *the force of law*,"[8] *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 542 (E.D. Va. 2015) (emphasis added). It is, as the Fifth Circuit has emphasized, "difficult to prove,"

---

[7] Arguably, merely the deprivation of a federal right will suffice. *King v. Kramer*, 764 F.3d 635, 649 (7th Cir. 2014).

[8] Under *Monell*, liability may be shown in four separate ways. *See, e.g.*, *Castanza v. Town of Brookhaven*, 700 F.Supp.2d 277, 287 (E.D.N.Y. 2010).

*Anderson v. Marshall Cnty., Miss.*, No. 15-60051, 2016 U.S. App. LEXIS 621, at *12–13, 2016 WL 143303, at *4 (5th Cir. Jan. 12, 2016), though some circuits permit trial courts to infer the requisite knowledge and indifference from a proven record of "widespread or flagrant violations," *Owens*, 767 F.3d at 403 (internal quotation marks omitted).

### 4.    Substantive Law: RA/ADA

Under well-established precedent,[9] prisoner may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA.[10] *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10, 118 S. Ct. 1952, 1954–55, 141 L. Ed. 2d 215 (1998); *see also, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011). Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state prisons fall squarely within this statutory definition, *Yeskey*, 524 U.S. at 210. As a general matter, a plaintiff proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008). Beyond these general guiding principles, five conclusions about the ADA's and

---

[9] Defendants once averred differently, (Doc. 76-1, 92-1). At present, they contest whether Plaintiff was denied an accommodation on the basis of a cognizable disability, not the RA/ADA's reach.

[10] Section 504 of the RA protects qualified individuals from discrimination on the basis of disability by entities receiving financial assistance from any federal department or agency. 29 U.S.C. § 794 *et seq.* Passed in 1973, the ADA expanded upon its protections. Naturally, therefore, the same prima facie case be made by a disabled plaintiff under both acts, *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999), and courts readily "examine cases construing claims under the ADA, as well as [S]ection 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts," *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

RA's applicability to LSP can be drawn from Fifth Circuit case law.

First, while the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). This distinction has two consequences. Overall, the ADA "does not require prisons to provide *new* services or programs for disabled prisoners." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added).[11] However, these same entities "do have an affirmative obligation to make reasonable modifications . . .  so that a disabled prisoner can have meaningful access to *existing* public services or programs." *Id.* (emphasis added).

Second, a plaintiff-inmate must usually request a modification to commence an interactive process that considers that possibility. *See Taylor v. Principal Fin. Grp., LLC*, 93 F.3d 155, 165 (5th Cir. 2009). Nonetheless, he or she is excused from doing so in a situation in which the defendant was unquestionably aware of the disability by, for example, receiving reports from its own doctor that recommend one or more specific accommodations. *Id.* Nonetheless, a pivotal caveat exists, for "failure to engage  in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that *he*

---

[11] In convincing detail, this Court dissects the cases upon which Defendants rely, most particularly *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008) and *Owens v. O'Dea*, No. 97-5517, 1998 U.S. App. LEXIS 10761, 1998 WL 344063, at *3 (6th Cir. May 27, 1998).

*proposed a reasonable accommodation.*" *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (emphasis added); *see also, e.g.*, *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000) (recognizing that the interactive process the ADA contemplates is not an end in itself).

Notably, whether an employer has failed to interact in good faith and thus failed to reasonably accommodate a plaintiff is a question of fact, one that can preclude summary judgment. *See Lowe v. Indep. Sch. Dist. No. 1*, 363 F. App'x 548, 552 (10th Cir. 2010) (as to an employer). The same can be said about the point in time when a certain medical condition like cataracts has rendered an indivdual disabled as defined by the RA/ADA. *See White v. Orange Auto Ctr.*, 101 F. Supp. 2d 485, 487, 494–95 (E.D. Tex. 2000) (issue of fact existed as to whether plaintiff who suffered from "poor vision, cataracts, and macular degeneration disease" was disabled within the meaning of the ADA); *cf. MacDonald v. Delta Air Lines*, 94 F.3d 1437, 1444–45 (10th Cir. 1996) (citing regulations explaining that to demonstrate that an impairment substantially limits the major life activity of working, an individual must show "significant[] restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities" and rejecting the argument that a cataract afflicted employee met this crucial component of the RA/ADA's definition of disability, as his "inability to perform one aspect of a job" did not deprive him of "the ability to perform work in general").

Third, Louisiana and its every sub-entity, including LSP, have most likely waived their Eleventh Amendment immunity from any RA-based suit under the express conditions of 42 U.S.C. § 2000d-7.[12] *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 345 (5th Cir. 2005) (holding that when a state entity accepts federal funds that are granted by Congress under

---

[12] As Defendants no longer contest the reach of these discrimination statutes, *see supra* note 9, they have implicitly conceded both law's applicability.

authority of the U.S. Constitution's Spending Clause and expressly conditioned on waiver of immunity from § 504 of the Rehabilitation Act, acceptance of such federal funds operates to waive the state's Eleventh Amendment immunity"). This section reads: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1). This Fifth Circuit ruling compels but one conclusion: assuming it accepted even a cent of federal funds, as Plaintiff contends, (Doc. 148-2 ¶¶ 30–32 at 4), Louisiana has fully forfeited any vestige of constitutional immunity for discrimination in contravention of the RA. *See Miller*, 421 F.3d at 345; *accord, e.g.*, *Vinson v. Thomas*, 288 F.3d 1145, 1152 (9th Cir. 2002).

Fourth, application of the ADA[13] to LSP, which bars the same kind of discrimination, does not even depend upon Louisiana's receipt of federal funds. Indeed, the Fifth Circuit has made this point crystal clear: "[T]he ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." *Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999) (quoting *Yeskey*, 524 U.S. at 209). More than two decades after *Yeskey*, the Supreme Court itself again endorsed this construction. *United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877, 881, 163 L. Ed. 2d 650 (2006) ("[I]nsofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."); *accord Tennessee v. Lane*, 541 U.S. 509, 522, 124 S. Ct. 1978, 1988, 158 L. Ed. 2d 820 (2004).

---

[13] It bears repeating, *see supra* note 3, that the ADA and the RA are "similar in substance and, with the exception of the RA's federal funding requirement, cases interpreting either are applicable and interchangeable," *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (internal quotation marks omitted).

Lastly, the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA and the RA. *See, e.g.*, *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). In actuality, no requirement for a showing of an intentional harm has yet been appended to either statute by other circuits. *E.g.*, *Liese v. Indian River Cnt. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir. 1999). In the context of the RA and the ADA, then, if not for purposes of the Eighth Amendment, "intentional discrimination against the disabled does not require personal animosity or ill will"; "it may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom." *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998). As such, based on much precedent, the failure to provide a disabled inmate with access to existing modifications can be held to violate the ADA's second title and the RA's five-hundred-and-fourth section. *See, e.g.*, *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *23–24, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) ("In the prison context, . . . failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").

**5.**     *Substantive Law: Qualified Immunity*

Qualified immunity is available when a § 1983 suit is brought against a state official in

his individual capacity, making him or her personally liable for any damages awarded to a plaintiff. 42 U.S.C. § 1983. "In deciding whether a state official is entitled to qualified immunity, it must first be determined whether a plaintiff successfully alleged facts showing the violation of a constitutional right by state officials." *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 431 (N.D.N.Y. 2005). "If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).[14] For the right to be so classified, its "contours . . . must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). "[I]f . . . [a] defendant's conduct was objectively reasonable in light of clearly established law at the time of the violation," however, even a right's status as firmly established will not foreclose qualified immunity's invocation. *Dorsett-Felicelli v. Cnty. of Clinton*, 371 F. Supp. 2d 183, 193 (N.D.N.Y. 2005).

This inquiry regarding whether a defendant's actions were objectively reasonable has been described as "a fact-intensive inquiry." *Id.*; *see also, e.g.*, *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *16 (S.D.N.Y. Dec. 2, 2004). For this reason, this particular affirmative defense can often prevent a plaintiff's success under Rule 56. Only in one situation have the cases trended differently: the evidentiary record made it impossible for any reasonable factfinder to not find a knowing violation of a clearly established right. *See McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004).

---

[14] Despite the language in *Saucier*, this two-part analysis need not proceed sequentially, and the order may be readily reversed depending on the case's peculiar circumstances. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009); *L.A. Cnty. v. Rettele*, 550 U.S. 609, 616, 127 S. Ct. 1989, 1994, 167 L. Ed. 2d 974 (2007) (per curiam).

6.      *Substantive Law: Exhaustion of Remedies under the PLRA*

42 U.S.C. § 1997e(a), as amended by the PLRA, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As the Court has held, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992, 152 L. Ed. 2d 12 (2002). As a general rule, the grievance need not adduce claims framed in perfect and comprehensive legal terminology nor identify each and every later defendant. Instead, "a grievance suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress." *Sapp v. Kimbrel*, 623 F.3d 813, 824 (9th Cir. 2010); *see also Thomas v. Joslin*, 524 F. App'x 107, 110 (5th Cir. 2013) (affirming a grant of summary judgment as plaintiff's grievances "failed to put" the relevant officials "on notice that . . . [plaintiff] intended to sue concerning alleged [their] indifference").


B.      **Application to Defendants' MSJs**

As this Court is compelled to "disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591, it finds that Defendants have not satisfied the high threshold for summary judgment implanted in Rule 56.

**1.      *Eighth Amendment Claim***

**(a)      *Existence of Sufficient Factual Support for Plaintiff's Eighth Amendment Claims under Rule 56***

First, more than enough facts can be gathered to support Plaintiff's Eighth Amendment claim. Per the existing record, even though several different doctors recommended Plaintiff for cataracts surgery, (*See, e.g.*, Doc. 148-1 at 2–7, 23–26; Doc. 127-6 (Ex. P); Doc. 127-10 (Ex. T), and though he was referred at least four separate times, (Doc. 127-10 (Ex. T)), LSP delayed this medically essential operation. It did so, Plaintiff alleges, on the basis of its own definition of "elective surgery," technically defined to include "medically-necessary" but nonetheless a "non-emergency procedure"; that this definition represents official policy is evidenced by its appearance in LDPSC's own Directive No. 13:030, (Doc. 126-6 (Ex. F) at 1), and LSP's more specific Health Care Policy No. HC-16, (Doc. 126-7 (Ex. G) ¶ 3A, at 1). Textually, the latter is almost Orwellian, self-evidently circular: "It is the Secretary's policy to provide *medically necessary* elective procedures or surgeries for offenders . . . when medically necessary." (Doc. 126-7 (Ex. G) ¶ 4, at 2 (emphasis added).)

That LSP generally adheres to this definition, arguably disregarding a doctor's judgment that a certain operation may be "medically necessary" by deeming the underlying problem to be a non-emergency, can be gleaned from this district's own docket,[15] in which similar such allegations have been advanced, (Docs. 126-7 (Ex. H), 126-8 (Ex. I), 126-10 (Ex. J), 127-1 (Ex. K), 127-2 (Ex. L)), and Defendant's own list of "inmates for whom a doctor recommended cataract surgery" but who await it still, (Doc. 127-3 (Ex. M); *see also* Doc. 148-1 at 8). In fact, at

---

[15] Pursuant to Federal Rule of Evidence 201, a court may always take judicial notice of its own public docket. *June Med. Servs. LLC v. Kliebert*, No. 14-CV-00525-JWD-RLB, --- F. Supp. 3d ---, 2016 U.S. Dist. LEXIS 8716, at *93 n.50, 2016 WL 320942, at *32 n.50 (M.D. La. Jan. 26, 2016) (collecting cases).

least two different officials with LSP and LDPSC, Doctor Randy Lane Lavespere ("Lavespeare") and Ms. Terri L. Cannon ("Cannon"), so testified, describing HC-16 and Directive No. 13:030 as "the prison's policy." (Doc. 140-1 (Ex. M.) at 77–85; Doc. 140-3 (Ex. O) at 36–39). Adhering to this policy, LSP did not provide Plaintiff with the recommended surgical operation for 813 days.[16] (*See, e.g.*, Doc. 148-1 at 26; *see also, e.g.*, Doc. 148-2 ¶ 10 at 2, ¶¶ 23–24, at 3; Doc. 151-1 at 3.)

Unquestionable and unquestioned, this evidence can be arranged so as to tell an elegantly simple—and damning—tale. LSP has a general program, (Doc. 140-3 at 38), effectively dogma, from which few deviations are, at best, grudgingly allowed, in which a doctor's "recommended" treatment will be ignored if classified as a "non-emergency," (Doc. 126-6 at 1), by a coterie of unknown "specialists," (Doc. 140-1 at 83–84). Thus, by adhering to this explicit policy, LSP treats cataracts as "non-emergency" by default even though, Lavespeare conceded, "[i]t can be medically necessary," such surgery becoming "necessary" "[w]hen the [appointed] specialist says that it needs to come out," (Doc. 140-3 at 85). As a matter of unambiguous law, refusing to "treat" a prisoner, "ignoring his complaints," "intentionally treat[ing] him incorrectly, or engag[ing] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" violates the Eighth Amendment. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Accordingly, "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury . . . deliberate indifference is manifest." *Lanzaro,* 834 F.2d at 346 (internal quotation marks omitted). If such denial occurs, "the alleged imposition of administrative inconvenience,

---

[16] Plaintiff counts days beginning on June 24, 2012, when LSU Hospital Personnel allegedly diagnosed him and recommended surgery. (Doc. 148-2 ¶ 10, at 2.) He received surgery on his right and left eyes on July 7 and September 15, 2014, respectively. (*Id.* ¶¶ 24–25, at 3.)

unattached to any legitimate penological objective such as security," will offer no excuse.

*Monmouth Cnty. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 337 (3d Cir. 1987); *see also, e.g.*, *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977) ("[C]ompliance with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds."). So convinced, more than one court has found deliberate indifference when a prison official knows of a prisoner's need and delays necessary medical treatment for a non-medical reason or prevents a prisoner from receiving needed or recommended treatment. *See, e.g.*, *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Applying this law to the facts at hand, the evidence so far uncovered could lead a reasonable jury to find that LSP and its agents, acting pursuant to an explicit statement of department policy, "intentionally" refused to provide care, though "knowledge[able] of . . . [his] need" for a specific type of operation, because it was clerically designated as "non-emergency" and was not classified otherwise by their chosen specialist. *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985). Undoubtedly, some doctors recommended cataracts surgery, and just as assuredly, more than one form described it as "medically necessary." (*See* Doc 148-1 at 23–26.[17]) Only certain specialists could have designated his "medically necessary" surgery as "emergency" and thus ensure that the recommended operation would take place; other doctors' opinions were simply irrelevant, (*See* Doc. 140-1 at 82), as both Plaintiff's four separate recommendations, (Doc. 127-10), and a single allusion to cost as a justification, can attest, (Doc. 148-1 at 26 n.7). In sum, because "[d]eliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment," *Ramos*

---

[17] Defendants' Opposition itself concedes this fact, acknowledging that Plaintiff's medical record described cataracts surgery as "medically necessary," if also "non-urgent" and subject to approval. (Doc. 151 at 9 n.2.) The precise import of this bureaucratic designation is a question of fact, a judgment predicated on deductions rather than incontestable principles of law.

*v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), enough evidence here exists for Plaintiff's constitutional claim to easily survive Defendants' MSJ. *See, e.g.*, *Richardson v. Nassau Cnty.*, 277 F. Supp. 2d 196 (E.D.N.Y. 2003) (denying summary judgment motion relating to Eighth Amendment deliberate indifference claim concerning glaucoma treatment). Certainly, with court after court presented with analogous factual circumstances have held that cataracts removal surgery falls squarely within the Eighth Amendment's protection. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1067-68 (9th Cir. 2014); *Boring v. Sanders*, No. 1:12-CV-419, 2013 U.S. Dist. LEXIS 114215, at *17–18, 2013 WL 4080308, at *8 (M.D. Pa. Aug. 13, 2013) (citing dozens of cases so determining), a jury in this case could clearly find in Plaintiff's favor.

### (b)      *Defendants' Inadequate Showing under Rule 56*

Defendants' counter to Plaintiff's account, in turn, is weak. Arguing that "the evidence" of medical indifference is "overwhelming[ly]" absent, Defendants point out that "Plaintiff had been under constant medical supervision and medical care at LSP." (Doc. 122-2 at 16; *see also* Doc. 151 at 7–10.) He always "received proper medication and treatment," Defendants' Opposition stresses, and "medical evidence shows that [P]laintiff was treated repeatedly for the ailments of which he complained." (Doc. 151 at 7, 9; *see also* Doc. 122-2 at 16.) He was, then, treated, and the Eighth Amendment, in Defendants' view, rightly impels no more.

Yet, in so averring, Defendants overstate the law's import. Of course, incorrect medical treatment, such as a mistaken diagnosis, is not actionable under the Eighth Amendment. *Estelle*, 429 U.S. at 105–06. However, even regular treatment, if known to be insufficient and ineffective for a diagnosed and serious ailment, will not be adequate to defeat Plaintiff's medical indifference claim. *See, e.g.*, *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)

("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."); *Norton v. Dimanzana*, 122 F.3d 286, 292 (5th Cir. 1997) (concluding that "[d]isagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs" when the medical record is unanimous). In other words, under binding jurisprudence, categorically inadequate treatment for a verifiably and knowingly worsening condition does not earn constitutional immunity simply because it is regularly provided; monotony does not somehow excuse patent inadequacy. Thus, as the Fifth Circuit itself said in the very case upon which Defendants rely, (Doc. 151 at 8), officials who "ignore[]" an inmate's "complaints" or "intentionally treat[] him incorrectly" contravene the Eighth Amendment. *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015). Considering the evidence adduced by Plaintiff—LSP consistently ignored Plaintiff's doctor-supported requests for surgery, classifying this ostensibly "medically necessary" operation as a "non-emergency" one—one could reasonably find his treatment to have been "intentionally . . . incorrect[]." *Id.*; *see also, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) ("[T]he blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that 'one eye is good enough for prison inmates' is the paradigm of deliberate indifference."). A verdict of unconstitutional medical indifference as to Plaintiff would then follow, reasonable and logical, based on the record as it now appears. *Cf., e.g.*, *Gobert*, 463 F.3d at 346; *Norton*, 122 F.3d at 292.

Moreover, Defendants overlook key factual differences between their handful of ostensible supporting case law, (Doc. 151 at 8–9), and the present matter. Unlike *Johnson v. Treen*, Plaintiff was not "treated repeatedly for the ailments of which he complained." 759 F.2d

1236, 1238 (5th Cir. 1985). Instead, if his evidence is believed, medically appropriate treatment was repeatedly requested by and denied to him. *See supra* Part III.A–B. In contrast with *Stewart v. Murphy*, a "pressure-sores deliberate-indifference case" in which "independent acts of negligence by various physicians" and "a difference in opinion as to the appropriate method of treatment under the circumstances" were evidenced, 174 F.3d 530, 535–36 (5th Cir. 1999),[18] both Plaintiff's ailment and the required treatment were arguably known and obvious, "medically-necessary" per LSP's own files, (*See* Doc. 26-6 at 1).

Lastly, Defendants' continually stressed case—*Brauner*—differs greatly in its procedural posture from Hacker's. There, "Brauner supported his claims primarily with his own statements (some of which were sworn under penalty of perjury), and largely challenged the medical decisions of his doctors." *Brauner*, 793 F.3d at 497. Based on such evidence, "[i]n a 22-page order, the magistrate judge reviewed the evidence and concluded that circuit precedent foreclosed a deliberate indifference claim." *Id.* Thereupon, "Judge Africk rejected the magistrate judge's report and recommendation in a brief order holding that there were genuine issues of material fact." *Id.* Here, as shown above, the evidence is extensive, and the record consists of more than the Plaintiff's own sworn statements, including his own doctor's medical statements. (*See also* Doc. 148-1 at 23–26; Doc. 155 at 4.) As "Hacker is not disputing any doctor's judgment or alleging that subordinates delinquently carried out doctors' orders," (Doc. 155 at 4), his case is unlike that of *Johnson*, *Stewart*, and *Brauner*.

The foregoing reasoning also resolves three other discrete arguments raised by Defendants. First, Directive No. 13:030, (Doc. 126-6 at 1), and Health Care Policy No. HC-16, (Doc. 126-7), indicate the existence of "a policy or custom," averred as such by Lavespere and

---

[18] Defendant emphasizes the fact that the inmate there died without medical indifference being found. (Doc. 151 at 8.)

Cannon, that specifically classifies certain "medically necessary" operations as elective and allows officials to override the recommendations of an inmate's own doctors. Seemingly, moreover, this policy has led to lengthy delays by other inmates in receiving recommended surgery, (Doc. 148-1 at 8). As with Plaintiff's individual medical indifference claim, such evidence is more than the scintilla required for Plaintiff's case to survive Rule 56's scrutiny.

Second, since sufficient enough evidence exists to support a finding of a broad policy, the argument for qualified immunity by three defendants—Jindal, LeBlanc, and Cain—as to this constitutional claim lacks merit. Quite simply, if it could be reasonably found that Defendants were deliberately indifferent to Plaintiff's medical needs in accordance with the general policy of LSP and LDPSC, a jury could just as reasonably find that Defendants ignored a clearly established constitutional right. If so, they would not be entitled to immunity. (*See* Doc. 148-1 at 35–36.) As the Third Circuit explained, "a reasonable [official] . . . could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiff[] and failing to adequately respond to that risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Accordingly, "[i] is axiomatic that conduct which is deliberately indifferent under the Eighth Amendment is *a fortiori* unreasonable." *Hollihan v. Pa. Dep't of Corr.*, No. 3:15-CV-5, 2016 U.S. Dist. LEXIS 6318, at *21, 2016 WL 235003, at *8 (M.D. Pa. Jan. 20, 2016).

Lastly, based on this same evidence, a reasonable jury could find Defendants to have known of Plaintiff's serious medical need, understood its dangers, and ignored these dangers in providing him with a certain work assignment. As a matter of law, such a finding would mean that Defendants did not provide Plaintiff with a workplace suitable for someone similarly

impaired, a discrete Eighth Amendment violation that Plaintiff has also advanced, (*See* Doc. 148-1 at 31.)

### 2.    *RA/ADA Claim*

### (a)    *Existence of Sufficient Factual Support for Plaintiff's RA/ADA Claim under Rule 56*

Defendants' contention that no RA/ADA claim could possibly be reasonably won cannot withstand scrutiny. Based on the clear applicability of the RA and ADA to both LSP and LDPSC, at least two facts, amply attested to by the existing record, foretell the failure of Defendants' MSJ. First, Plaintiff was diagnosed with cataracts and progressively worsening eyesight over a period of years, (*See, e.g.*, Doc. 148-1 at 23–26), as Defendants' own timeline divulges, (*See* Doc. 151-1 at 2–6). Second, though LSP on at least one occasion gave him a modified duty schedule, it never provided him with permanent modifications specially designed for the visually impaired; at best, ad hoc adjustments were made. Hence, for example, though his medical "records note that Plaintiff needed surgery" on October 17, 2012, and though LSU Interim Hospital "recommended surgery as soon as possible" on April 2, 2013, (Doc. 151-1 at 3 (internal quotation marks omitted)), Plaintiff continued to work in Angola's fields, (Doc. 148-1 at 31–32). Tellingly, Peabody, LSP's ADA coordinator, conceded: "I think the department would say if he is legally blind to the point where it interferes with his ability to perform his job, then yes . . . he should not be in the field." (Doc. 140-2 (Ex. N) at 43.) Equally significantly, Lavespeare arguably seemed to agree. (Doc. 139-10 (Ex. L) at 61–62 (noting that "[o]ut in the field" you could "hurt yourself" if your vision is impaired).) Plaintiff made these allegations in the Amended Complaint, (Doc. 73), and he has now assembled enough evidence, including other

instances in which LSP and/or LDPSC failed to accommodate impaired inmates, to substantiate his contentions for Rule 56's limited purposes.

Consequently, a reasonable jury could find Defendants knew of Plaintiff's disability, understood its consequences, and ignored these dangers in providing him with his work assignments, entirely ignoring the possibility of and the need for providing him with a permanently modified duty schedule suitable for someone with a failing eyesight. Per the record, LSP gave him temporary modified duty status at least once; one could infer that it could have done permanently but chose not to do so. This evidence, so reasonably read, suggests that Plaintiff was not accommodated in accordance with the ADA/RA, either statute's intent prong satisfied by LSP's failure to provide Plaintiff with access to existing modifications, i.e. a non-field work position. (*See* Doc. 148-1 at 9–10; Doc. 155 at 2–3.) Confronted with similar facts, other district courts have denied similar motions by other prisons. *See, e.g.*, *Hollihan*, 2016 U.S. Dist. LEXIS 6318, at *3, 2016 WL 235003, at *5 (collecting cases). With the record here by no means conclusively to the "contrary," as Defendants allege, this Court concurs with these courts.

Defendants' second argument in favor of summary judgment as to this claim—Plaintiff failed to properly exhaust his remedies, as the PLRA requires, by not specifically requesting an accommodation (beyond cataracts surgery) pursuant to the ADA/RA in his ARP—is oversold. Per the PLRA, "a grievance complaint must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." *Rebaldo v. Jenkins*, 660 F. Supp. 2d 755, 763 (E.D. La. 2009). It need not "give adequate notice of all claims or potential defendants." *Id.* Rather, an ARP must do no more than "address the same inappropriate behavior by . . . [Defendants] that is addressed in the" later filed suit. *Id.* Plaintiff's ARP, as well as his medical record, leave no doubt as to the nature of his complaint: his

worsening eyesight and approaching blindness. While he may have specifically asked for surgery, no reasonable reader could be confused about the underlying medical problem; indeed, LSP and LDPSC specifically define "cataracts surgery" as "medically necessary." With enough evidence available to validate this inference, a reasonable jury could readily reach the pivotal subsidiary conclusion that Defendants were on notice of Plaintiff's need for an accommodation, as his declining vision necessarily rendered him unable to perform the work of an inmate whose vision was unimpaired. The PLRA requires no more than such holistic and general notice, one which Plaintiff's ARP sufficiently provided.

## C.      Application to Plaintiff's MSJs

Subjected to the same standard that has proven inimical to Defendants' MSJ, Plaintiff's MSJ too falters. If one "disregard[s] all evidence favorable to the moving party that the jury is not required to believe," *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591, Plaintiff's case falls apart, and Defendants would be vindicated. Simply put, a jury could still disbelieve Plaintiff's contentions and interpret his evidence differently and, by so doing, conclude that Plaintiff's claims lack merit. Because this result may still reasonably come to fruition, a genuine dispute over material facts remains that only a jury can properly resolve.

## 1.      *Eighth Amendment Claim*

Just as the record could be construed to reveal Defendants' knowledge of Plaintiff's serious medical need and deliberate unwillingness to provide medically necessary treatment, it could also be construed differently: although cataracts removal surgery was repeatedly recommended, no doctor labeled Plaintiff's declining eyesight an emergency which necessitated

immediate resolution. (Doc. 151-1 at 1–6.) Even the one doctor who recommend it "as soon as possible" did not choose to deem it "urgent" or "emergency," as LSP's and LDPSC's policies require before an operation is expeditiously scheduled. Meanwhile, as Plaintiff's medical file attests, he received treatment which, though inadequate in stymieing his encroaching blindness, was still treatment. Court after court has "distinguish[ed] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see also supra* Part IV.A.2. Plaintiff clearly received medical care without one physician choosing to label his condition an "emergency," (*See, e.g.*, Doc. 122-2 at 16; Doc. 151 at 7), and in such cases, "federal courts are generally reluctant to second guess medical judgment." *Westlake*, 537 F.2d at 860 n.5; *see also, e.g.*, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992) ("The treatment may not have been the best that money could buy, and occasionally, a dose of medication may have been forgotten, but these deficiencies were minimal, they do not show an unreasonable standard of care, and they fall far short of establishing deliberate indifference by the prison authorities."). True, "more could [have] be[en] done for him and with greater alacrity." *McQueen v. LeBlanc*, No. 14-174, 2014 U.S. Dist. LEXIS 116632, at *6, 2014 WL 4182617 (E.D. La. Apr. 8, 2014). Still, so long as a prisoner has received "some medical treatment and the dispute is over the adequacy of the treatment," the Eighth Amendment has not been violated. *Westlake*, 537 F.2d at 860 n.5.

Here, based on both Parties' papers, the evidence can be so construed. Looking at the record, one could still find that Plaintiff endured no more than constitutionally permissible, if morally objectionable, "negligence or medical malpractice." *See, e.g.*, *Hall*, 190 F.3d at 697–98; *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Kelly v. Gusman*, No. 07-611, 2007

U.S. Dist. LEXIS 99098, at *12, 2007 WL 2007992, at *4 (E.D. La. July 5, 2007).[19] Put differently, "the right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice," with the provision of "other forms of treatment" for a particular condition held sufficient to defeat an Eighth Amendment claim entirely. *Rathy v. Wetzel*, No. 13-72, 2014 U.S. Dist. LEXIS 15331, at *15, 2014 WL 4104946, at *7 (W.D. Pa. July 28, 2014). Here, the evidence could be so weighed by a reasoned mind, thereby establishing the existence of a genuine dispute over the adequacy of LSP's treatment of Plaintiff. As such, Rule 56 forbids the granting of Plaintiff's MSJ as to his Eighth Amendment claims.

**2.      *RA/ADA Claim***

Though a much closer call, Plaintiff's demand for summary judgment on his RA/ADA claim falls due to the standard erected by Rule 56. To "win" his disability case at this stage, Plaintiff needed to show no reasonable jury could not conclude that his cataracts rendered him disabled, that his disability substantially impaired his ability to perform a wide class of positions, and that Defendant failed to provide him with a reasonable accommodation. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009); *see also supra* Part III.A.4. At present, however, every one of these essential conclusions can be questioned. For every alleged interpretation of the same fact, a counter-interpretation, also supported by the existing record, can be posited. As no contention can be decided indisputably in Plaintiff's favor, summary judgment is not appropriate.

---

[19] Relatedly, the existence of such an ambiguous record and a history of treatment makes it hard to conclude, on motions alone, that any Defendant acted with the subjective culpability that Eighth Amendment jurisprudence requires.

True, Plaintiff's cataracts made him increasingly and eventually totally blind. But at least one appellate court has specifically refused to classify cataracts as a cognizable disability under the ADA, as the afflicted person could nonetheless perform "a class of jobs or a broad range of jobs in various classes." *MacDonald*, 94 F.3d at 1444–45. Convinced by this reasoning, multiple courts have refused to consider either cataracts or legal blindness as an automatic disability under the RA/ADA, as someone so impaired is "disqualifie[d] . . . from only a narrow range of jobs," such an impairment not so "substantially limiting" as to render the afflicted legally disabled. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994). Plaintiff's cataracts, therefore, did not indisputably render him disabled as a matter of law.

True, Plaintiff could have been provided any number of reasonable accommodations. But a failure to accommodate claim first requires a plaintiff to pinpoint a proposed reasonable accommodation, the law's burden upon him and him alone, and Plaintiff's own lawyers here have conceded that he sought a single "specific accommodation – that he be scheduled for cataracts surgery without any delay.'" (Doc. 130 at 15.) If one disregards evidence the jury need not believe, LSP arguably did far more than reject Plaintiff's proposed sole accommodation. Instead, on more than one occasion, it modified Plaintiff's schedule, a reasonable modification, in an attempt to account for his declining eyesight. (Doc. 151-1 at 4.) While some of these modifications were temporary and even imperfect, as Plaintiff himself concedes, on June 12, 2013, Plaintiff eventually "received a *permanent* duty status intended to keep him from working in the fields." (Doc. 148-1 at 33 (emphasis added).) However halfhearted, LSP's efforts before and after June 12, 2013, undercut the conclusion that Plaintiff received no reasonable accommodation. *See Rorrer*, 743 F.3d at 1041. Arguably, then, the RA/ADA was not necessarily

offended by Defendants' chosen route, with only such certainty compelling Plaintiff's victory under Rule 56. In contrast, the uncertainty that now exists requires the opposite.

True, Plaintiff needed and desired surgery, without which he was becoming disabled. But "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010). So construed, neither the RA nor the ADA is violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (as to Section 504); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (as to the ADA); *see also, e.g.*, *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (emphasizing that "courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care"); *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness [under the Rehabilitation Act] must be framed within some larger theory of disability discrimination."). As in the medical indifference cases, it "does not create a remedy for medical malpractice," *Bryant*, 84 F.3d at 249, and "purely medical decisions . . . do not ordinarily fall within the scope of the ADA or the Rehabilitation Act," *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005). Minimal treatment not based on a discriminatory motive may meet the ADA and RA, if a jury so determines, as here it still could, based on the uncontroverted facts.

True, Plaintiff's cataracts rendered him legally blind and realistically disabled, and the latter fact could be found to have been obvious. Yet, this exception is narrowly understood, and a defendant will usually only be held liable for not accommodating an obvious disability when its doctors have recommended a specific accommodation. *See Taylor*, 93 F.3d at 165. Here, however, while several of Plaintiff's doctors recommended surgery, none advised LSP to place

Plaintiff on a permanently modified duty schedule, the one accommodation that would have prevented his actual physical injury in Angola's fields. It could, then, be believed that LSP—and, by implication, the other defendants—did not deny Plaintiff access to certain services solely by reason of disability, though such a motive is necessary for the RA and ADA to have been contravened in the prison context.

True, Plaintiff has an extensive record attesting to his need for cataracts removal surgery, and it would not be unreasonable for a jury to find him to have become disabled by virtue of this delay. In some sense, it could be depicted as a rather predictable—perhaps even unavoidable—outcome that triggered LSP's obligation to accommodate an impairment that it still seemingly refused to effectively and fully treat. Yet, whether a defendant failed to engage in good faith efforts to accommodate a plaintiff's disability is a question of fact often held to preclude summary judgment, *see, e.g.*, *Lowe*, 363 F. App'x at 552, and rarely found when, as here, a defendant has not totally ignored a plaintiff's disability by failing to make any attempt at a complete accommodation. *Cf. Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (holding that under the ADA and RA, a demand for "reasonable accommodations to assure access to an existing program" is cognizable, but a demand for "additional or different substantive benefits" is not).

In the end, despite the strength of Plaintiff's RA/ADA claims, the law and the facts do not make it impossible for Defendant to win a jury's reprieve, Rule 56 barring Plaintiff's success on the papers so far submitted and the evidence so far adduced.

## V.     CONCLUSION

A fair review of the record in this case reveals that both Parties have provided more than a modicum of evidence for their respective yet incompatible positions. With both sides having assembled some evidence from which both have constructed colorable claims or defenses, it is impossible to conclude that a reasonable jury would incontestably find in either's favor on every such assertion as a matter of law. Indeed, the fact that Defendants and Plaintiff have filed dueling dispositive motions, citing to specific portions of an already expansive record, militates for this conclusion. Above all else, as jurisprudence amply evinces, questions surrounding the Eighth Amendment and the RA/ADA are invariably fact-intensive, often dependent upon determinations of fact for which juries are empaneled. Such is the case here. For these reasons, this Court **DENIES Defendants' Motion for Summary Judgment**, (Doc. 122), and **Plaintiff's Motion for Summary Judgement**, (Doc. 148).

Signed in Baton Rouge, Louisiana, on June 6, 2016.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**