**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JASON HACKER )<br>            Plaintiff, )<br>    v. )<br>                  )<br>N. BURL CAIN, et al )<br>           Defendants, ) | Docket No. 14-063-JWD-EWD |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION**
**FOR A NEW TRIAL AND RENEWED JUDGMENT AS A MATTER OF LAW**

NOW INTO COURT, through undersigned counsel, comes the Plaintiff Jason Hacker who, pursuant to this Court's March 3, 2017 order, *see* R. Doc. 291, files this supplemental memorandum to respectfully request that this Court grant judgment as a matter of law or, in the alternative, a new trial.

**I.      INTRODUCTION**

Plaintiff seeks a new trial or judgment as a matter of law on five independent grounds, each based on the conduct of counsel, conduct of witnesses, or the weight of evidence against the jury's verdict.

In brief, the five grounds are:

1.      At trial, Defendants' counsel violated three motions in limine in the opening statement alone – including a motion in limine that this Court explicitly premised on avoiding "unfair prejudicial effect."

2.      The ADA and RA define "disability" to include having a "record of a disability." But the jury ruled that Mr. Hacker was not disabled, even though Defendants provided no evidence whatsoever to rebut Plaintiff's voluminous evidence that he had a record of a disability.

3.      Although the weight of the evidence at overwhelmingly supported a failure-to-accommodate claim, the jury ruled against Mr. Hacker's ADA claim. They ruled this way despite, for example, Defendants' concession in evidence that no interactive process was completed, and the proper response to Mr. Hacker's pleas for help would have been to remove Mr. Hacker from the fields.

4.      A new trial can be granted if "the verdict was based on false testimony," and here, witness Warden Peabody, the ADA coordinator for Angola, testified that a temporary impairment is not a disability under the ADA – a statement that has been false for nearly a decade.  The jury's conclusion that Mr. Hacker was not disabled is logical if the jury believed Warden Peabody's false testimony, and so a new trial is needed to remove the stain.

5.      Finally, a new trial or JMOL is needed because the jury's verdict with regards to the Eighth Amendment "dangerous work" claim is belied by the evidence presented to the jury. For example, Defendants conceded in evidence that "if inmates are legally blind to the point where they can't see a certain distance around them, then yes [working in the fields would be "a dangerous thing to do"]" and that such an inmate "should not be in the field."  Yet it was undisputed at trial that Defendants labeled Mr. Hacker "legally blind" and made him continue to work in the field even over his protests. They conceded that they forced him into a series of escalatingly dangerous jobs in the kitchen and manufacturing plant.

Any one of these five grounds is sufficient to necessitate JMOL or a new trial. When viewed cumulatively, the grounds become overwhelming. JMOL, or a new trial in the alternative, should issue here.

## II.      DISCUSSION

Under Federal Rule of Civil Procedure 59(a), a "court may, on motion, grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." The Court has broad discretion in granting new trials, and may set aside a verdict even though there is substantial evidence to support it. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court."); *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998). On a motion for new trial, the court need *not* view the evidence in the light most favorable to the verdict winner. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc*. 563 F.3d 1358, 1371 (Fed. Cir. 2009); *U.S. ex rel Garibaldi v. Orleans Parish School Bd.*, 46 F. Supp. 2d 546, 552 (E.D. La. 1999). Thus, a motion for a new trial is a "much more lenient test" than for renewed judgment as a matter of law (Wright & Miller § 2531), and will not be upset upon appeal unless an abuse of discretion (*Jones v. Wal-Mart Stores, Inc.,* 870 F. 2d 982, 986 (5th Cir. 1989)).

Under Federal Rule of Civil Procedure 50(b), a plaintiff may file a "renewed motion for judgment as a matter of law," asking the court to find that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the defendant on specific issues.  The Federal Rules specifically allow that these two legal remedies – a new trial and renewed judgment as a matter of law – may be sought in the alternative in a post trial motion.  Fed. Rule Civ. Pro. 59(b).

## A.      A New Trial is Necessary to Remedy Defense Counsel's Cumulatively Prejudicial Violations of This Court's Orders During Opening Statements.

A new trial should be granted when counsel violates a motion in limine unless the court "is sure that the error did not influence the jury, or had but very slight effect."

*Hollybrook Cottonseed v. Guarantee & Liability*, 772 F. 3d 1031, 1034 (5th Cir. 2014) (upholding grant of new trial when defense counsel violated a motion in limine.).

Here, anticipating a risk of prejudicial argument at trial, Plaintiff's counsel filed motions in limine, and this Court granted many of them. R. Doc. 235.  Defense counsel, however, did not heed the orders. In his opening statement alone, Defense counsel violated three of this Court's rulings.

The first violation related to Mr. Hacker's conviction. This Court ordered that Defendants could say that Plaintiff was "convicted of a felony for which he is serving a sentence at Louisiana State Penitentiary at Angola," but no more. The Court ordered this so as to avoid "unfair prejudicial effect under Rule 403." *Id.* at 1. But in the first few lines of his opening statement, defense counsel violated that restriction by referring to Plaintiff's "life sentence." He said: "What's this case about?  Well, Jason Hacker is serving a life sentence at Angola where he has been since the year – early 2000s." Tr. Vol. I, at 23. The Court sustained Plaintiff's objection. *Id.* at 55. "Life sentence" is a loaded phrase: because life sentences are automatically applied in Louisiana to murder and rape, it is very plausible that the jury would have concluded that Mr. Hacker was a murderer or a rapist based on defense counsel's statement. *See* La. R.S. § 14:30(C)(2); 14:30.1(B); 14:42(D).

Next, this Court ordered that "evidence of medical problems and treatment unrelated to Plaintiff's cataract condition will not be allowed except as it may bear on the issues related to Plaintiff's cataracts." R. Doc. 235 at 2. Despite this order, Defense counsel began pulling up medical records in his opening statement and narrated medical issues completely unrelated to cataracts. He pointed to a medical record showing treatment for heart palpitations and insomnia, and said: "these are lab values, complete blood count, CEM-14 . . . he's complaining of heart palpitation." Jan. 30 at 25. At that

point, Plaintiff's counsel objected. This Court ruled that "anything that's unrelated to the

cataracts or a possible cause of the cataracts, regardless of when it happened, is not going

to be permitted."[1] *Id.* at 27.  But Defense counsel *immediately returned* to the forbidden

topics:

| | |
|---|---|
| The Court: | All right. You may proceed. |
| Mr. Blanchfield: | Thank you, Judge. I left off, this is January of 2012, when we were talking about the treatment the plaintiff was receiving, there were references to heart palpitations, visual weight loss, insomnia, and you're going to hear testimony about all these lab tests that were done in January 2019 (sic) trying to figure out just what kind of problems the Plaintiff was suffering from. |

Tr. Vol. I at 29.

Finally, Plaintiff moved for a motion in limine to bar Defendants from referring to

Mr. Hacker's prison disciplinary record. In response, Defendants promised that they

would "not introduce any evidence at trial regarding Plaintiff's disciplinary record at

Angola." R. Doc. 183 at 2. As a result, the Court determined the motion to be moot, but

cautioned Defendants that "[s]hould Defendants attempt to introduce such evidence for

[the] limited purpose [of determining whether Plaintiff should be shackled], Defendants

are instructed to do so outside the presence of the jury." R. Doc. 235 at 2.   But Defense

counsel nevertheless brought it up in his opening statement:

| | |
|---|---|
| Mr. Blanchfield:  . . . | What you're going to hear the testimony and the evidence is going to be Jason Hacker broke all the rules. |

Jan. 30 at 33. Plaintiff's counsel objected, and the Court ruled:

| | |
|---|---|
| The Court: . . . | This is a violation of my order, Mr. Blanchfield, and frankly, it's the second time you've done it. They didn't even object to the first one and I'm getting really really |

---

[1] Later in the trial the Court was even more explicit: "It's the connection to the cataract. So that if you're going to get into heart palpitations and heart palpitations have nothing to do or could not possibly have anything to do with his cataract problems and its irrelevant, except to say to the jury: this guy is in bad shape generally, and therefore, you draw from that whatever you want to draw." Tr. Vol. III at 100.

upset with you. I'm getting very upset with you. So I'm going to tell you do not violate my order in any way again. If you do, you're going to be in serious trouble. . . the objection is sustained.

*Id.* at 35.

A single one of these violations alone would be prejudicial; with all three together, the prejudice is even stronger. This is especially true considering that this Court's order was explicitly premised on avoiding "unfair prejudicial effect." R. Doc. 235 at 1.

Compare the situation here to that of *Hollybrook Cottonseed,* 772 F. 3d 1031 (5th Cir. 2014). In that case, the Fifth Circuit upheld a grant of a new trial when counsel violated a motion in limine by eliciting a single piece of barred testimony regarding a settlement offer. *Id.* at 1034 – 1035. The violation of the motion in limine was found to require a new trial, even though the court gave an immediate curative instruction and polled the jury for assurance that the jurors could ignore the improper evidence. *Id.*

Here, we have not one violation of a motion in limine, but three. Nor was there any curative instruction or poll of the jury. A new trial is necessary to protect Plaintiff's rights and the integrity of this Court's orders.

**B.      This Court Should Grant the JMOL or a New Trial in Light of the Uncontroverted Record of a Disability and Other Evidence of Disability**

A new trial can be granted if a verdict is against the great weight of the evidence, *Jones v. Wal-Mart Stores, Inc.*, 870 F. 2d 982, 986 (5th Cir. 1989), and the Court need not view the evidence in the light most favorable to any party (*see* Section II, *supra*). JMOL can be granted if the "facts and inferences point so strongly and overwhelmingly in favor of one party" that reasonable jurors could not disagree. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (*en banc*), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc).

The Americans with Disabilities Amendments Act defines disability in three ways; two of which are relevant here:  (1) a disability is "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual or (2) a person has "a record of such an impairment."  42 U.S.C. § 12102(1)(A)-(B).  A non-exhaustive list of major life activities includes performing manual tasks, seeing, eating, walking, lifting, bending, learning, reading, communicating, and working.  42 U.S.C. § 12102(1)(2)(A).  "An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  28 C.F.R. § 35.108(e)(1).  *See also Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1134 (11th Cir.1996).

"The definition of disability in [the ADA Amendments Act ] shall be construed in favor of broad coverage of individuals…to the maximum extent permitted[.]"  42 U.S.C. §§ 12102(4)(A); 12101(a)(1); 12101(b)(1); 28 C.F.R. § 35.108(e)(2).  *See also Summers v. Altarum Institute Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (holding that the plaintiff had alleged a disability by stating that "his accident left him unable to walk for seven months and that without surgery, pain medication, and physical therapy, he `likely' would have been unable to walk for far longer.").

*1. Mr. Hacker had a disability.*

Plaintiff presented a glut of evidence that he had a disability according to the Americans with Disabilities Amendments Act.  See 28 C.F.R. § 35.104.  Indeed, the Defendant's 30(b)(6) representative and ADA Coordinator admitted that Mr. Hacker had a disability at trial:

> Q. But, Warden, You know, Mr. Coordinator, the definition of disability under the Americans with Disabilities Act.
> A. Yes.
> Q. And it's a physical impairment, correct?
> A. Correct.
> Q. That impairs life activities?

A.      Yes, major life function.

Q.      And an example of a physical impairment is a cataract?

A.      I'm not aware that cataract is – now I'm aware that blindness is, but cataracts, no.

Q.      No, you don't think cataracts is a physical impairment?

A.      It depends upon the severity of the cataracts.

Q.      If it's causing someone to be declared legally blind that would be pretty severe, correct?

A.      I would consider that severe.

Q.      Okay. And if it's affecting their ability to walk, that would be a major life activity, correct?

A.      Correct.

Q.      If it's affecting their ability to work that would be a major life activity, correct?

A.      Yes.

Q.      I'm sorry?

A.      Yes.

Q.      And affecting their ability to exercise, that would be a major life activity, correct?

A.      Yes.

Q.      Affecting their ability to play music that would be a major life activity, correct?

A.      Yes.

Q.      Affecting their ability to read and write letters, correct?

A.      Yes.

Q.      **So this person has a disability, Warden.**

A.      **Yes.**

Q.      And they should have gotten an accommodation?

A.      The accommodation that was recommended was surgery, which I believe he did get.

Tr. Vol. I, at 110-111 (emphasis added).[2]

Mr. Hacker's eyesight decline impaired the major life activity of seeing, as well as "performing manual tasks, walking… hearing, speaking, breathing, learning, and working." 28 C.F.R. § 35.104(2). That the jury found against Mr. Hacker on this point was against the weight of the evidence in seemingly every respect.

In addition to Defendants' concession of a disability, Mr. Hacker presented a great, varied volume of evidence that he had a physical impairment that affected a major life activity. A partial list of that evidence includes:

---

[2] While the questioning began as a hypothetical, Warden Peabody's statement at the end ("surgery, which I believe he did get") makes clear that he was talking about Mr. Hacker.

- Medical record evidence showing that Mr. Hacker passed the point of legal blindness (20/200 in the best corrected eye, or limited visual field), progressing to the point that one of his eyes was 20/400 and the other could only sense "light perception." Joint Stipulations at ¶ 18, 23; DEFENDANTS – 000269, 000102, 000697.

- Undisputed medical record evidence that on October 17, 2012, Angola's Dr. Coullard assessed that Hacker "needed surgery" for his cataracts.  *See* Joint Stipulations at ¶ 11.

- Undisputed medical record evidence that a LSU doctor recommended that Mr. Hacker receive cataract surgery "ASAP" in 2013. DEFENDANTS – 000255, 256

- Medical evidence that Jason requested to be removed from the field since his cataracts prevented him from seeing.  Tr. Vol. I, at 81-82.

- Undisputed medical record evidence that on May 16, 2013, Mr. Hacker complained to EMTs of blurry vision, pain and burning in his eyes, and had to be given three days relief from field work duty. Pl. Ex. 77 at 35, 34; PLAINTIFF – 002399, 002398; Tr. Vol. I, at 85-86, 116.

- Undisputed medical record evidence that on May 22, 2013, an Angola doctor declared Mr. Hacker legally blind and recommended that he be given relief from work duty. The doctor wrote "<u>duty status </u>needed." (Emphasis in original.) *See* Undisp. Facts at ¶ 18; Pl. Ex. 77 at 67, 33; PLAINTIFF - 002431, 002397; Tr. Vol. I, at 90-91.

- Dr. Edward Bell, an expert in the management and accommodation of persons with visual impairments, testified that Mr. Hacker's complaints were consistent with his medical records as well as other people who have visual impairments, Tr. Vol. II, at 192-193, 196; that prisoners with visual impairments run the danger of bumping into things in prison or tripping over hazards, keeping up with your belongings and managing mail and other printed material.  *Id*., at 194-195.

- Notes and written complaints by Mr. Hacker providing contemporaneous accounts of the impact of his visual impairment on his daily life. PLAINTIFF – 002337, 000695.

- Two prisoners, Jackie Wafer and Scott Meyers, testified about the difficulties Mr. Hacker experienced before his cataracts were removed.  Tr. Vol. I, at 41-48; Vol. II, at 69-80.  He had problems judging distance and recognizing people and reading music.  Tr. Vol. I, at 41; Vol. II, at 78-79.  They testified that Mr. Hacker had trouble reading and writing music due to his visual impairment as well as walking around the prison and recognizing people who he knew.  *Id*. Vol. II, at 75-76, 78.  This prevented him from participating in playing music and exercising, activities to which other prisoners without a disability have access.  Tr. Vol. I, at 90-91.  Vol. II, at 75-76, 78.  Similarly, Jason had trouble using the mixing board to make music.  Vol. II, at 79-80.

- Two prisoners, Jackie Wafer and Scott Meyers, testified that Plaintiff's visual impairments preventing him from accessing certain activities like eating food.  Tr. Vol. I, at 42.  He had to stop lifting weights and working out.  Tr. Vol. I, at 45.

- Email evidence that on June 12, 2014, Angola medical staff wrote to Medical Director Singh that Mr. Hacker "has been complaining of blurred vision to both eyes since 10/2011," and was prescribed glasses but they "helped very little." PLAINTIFF – 002866.

- Mr. Hacker's own testimony that, while he had cataracts, he could not engage in the major life activities of seeing, walking, or reading. 28 C.F.R. § 35.104(2); *see also Colwell v. Rite Aide Corp.*, 602 F.3d 495, 501 (3d Cir. 2010); 29 C.F.R. § 1630.2(h)(i) (2005).

   *2. Mr. Hacker had a "record of such an impairment."*

   Additionally, during this trial, Plaintiff presented the jury with varied evidence

that he had a <u>record</u> of a disability, including:

- Medical record evidence showing that Mr. Hacker passed the point of legal blindness (20/200 in the best corrected eye, or limited visual field), progressing to the point that one of his eyes was 20/400 and the other could only sense "light perception." Joint Stipulations at ¶ 18, 23; DEFENDANTS – 000269, 000102, 000697.

- Undisputed medical record evidence that on May 22, 2013, an Angola doctor declared Mr. Hacker legally blind and recommended that he be given relief from work duty. The doctor wrote "<u>duty status </u>needed." (Emphasis in original.) *See* Joint Stipulations at ¶ 18; Pl. Ex. 77 at 67, 33; PLAINTIFF - 002431, 002397.

- Undisputed medical record evidence that on July 2, 2013, Angola personnel observed that Mr. Hacker was "legally blind." Joint Stipulations at ¶ 17; PLAINTIFF -002394.

- Medical evidence that the prison classified Mr. Hacker's reasonable accommodation requests as requesting a "duty status for blind." Tr. Vol. I, at 105-106.

- Undisputed medical record evidence that multiple doctors wrote that Mr. Hacker "needs" surgery. *See* Joint Stipulations at ¶ 11. One doctor even wrote that he needed the surgery "ASAP." DEFENDANTS – 000255, 256. As a result, on April 2, 2013, a LSU ophthalmologist wrote that he needed surgery "as soon as possible, patient has a visually significant cataract, cataract extraction when approved; pending consults for cataract removal." *Id.*

- Undisputed record evidence in the form of an ARP response that: "Documentation supports that on 5-22-2013, [Mr. Hacker] w[as] seen by Dr. Coullard and after examination notes indicated that [Mr. Hacker is] legally blind, secondary to kerratoconus and cataracts can [sic] count fingers with your right eye." PLAINTIFF – 000701; Tr. Vol. I, at 123-124.

- Undisputed email record evidence that on November 12, 2013, DOC Headquarters staff wrote to Medical Director Singh about Mr. Hacker. Second Seal Portion of

Transcript, Vol. II, at 27-30.  The email states that Mr. Hacker is "having difficulty seeing out of right eye despite new glasses," "blurred vision," and "legally blind." Id., at 29. The email noted that a doctor had referred Mr. Hacker for a duty status due to his visual impairment. PLAINTIFF – 002863 – 002865.

• Undisputed email record evidence that on June 12, 2014, Angola medical staff wrote to Medical Director Singh that Mr. Hacker "has been complaining of blurred vision to both eyes since 10/2011," and was prescribed glasses but they "helped very little." PLAINTIFF – 002866.

That Defendants own records that show Mr. Hacker had low visual acuity, was legally blind, and was therefore moved out of the fields, are evidence enough that he had a record of having a disability. *See HaSnead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1089 (9th Cir.2001) ("The many physicians' notes and various letters in the record, combined with Snead's prolonged leave, create at least a genuine issue of fact regarding a record of Snead's impairment."); *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1134 (11th Cir.1996) (paid and unpaid disability leave establish evidence of a record of being impaired).  Defendants essentially conceded this at trial when they claimed that they accommodated Mr. Hacker by taking him out of the fields in August 2013. Tr. Vol. I, at 110-111. (It would be absurd to claim *both* that they accommodated his disability and *also* that they never had any record of such disability.)

There is nothing to counterweigh Plaintiff's evidence of a record of disability; Defendants put on no evidence whatsoever to rebut it. They did not object to the genuineness of the medical records or emails. They produced no medical records of doctors retracting the "legally blind" determination. They produced no emails of DOC officials disagreeing with the doctors' determinations.

This is therefore precisely the kind of fact pattern for which the FRCP's new trial/JMOL rules were created; a situation in which the evidence at trial (unrebutted evidence of a record of disability) is a complete mismatch with the jury's verdict (no disability). *See FRCP 50 Notes of Advisory Committee on 1991 Amendment*. ("The

revision of this subdivision aims to facilitate the exercise by the court of its responsibility

to assure the fidelity of its judgment to the controlling law, a responsibility imposed by

the Due Process Clause of the Fifth Amendment. *Cf. Galloway v. United States*, 319 U.S.

372 (1943).") This Court should grant this motion.

**C.     JMOL or a New Trial is Necessary Because The Evidence Presented at Trial Overwhelmingly Supports an ADA/RA Violation**

In addition to the "record of a disability" issue, JMOL or a new trial is needed

needed because the evidence presented at trial overwhelmingly proved an ADA/RA

violation: Plaintiff presented a plethora of evidence that Mr. Hacker had a disability, that

the prison was on notice of his need for an accommodation for that disability, and that the

prison refused to grant him that accommodation.

*1.   The Defendants Knew of Mr. Hacker's disability and the need for an accommodation.*

Mr. Hacker made a reasonable accommodation request to the eye clinic in late

June 2013.  Tr. Vol. I, at 97.  The prison did not follow the interactive process after

receiving that letter.  Tr. Vol. I, at 104-105, 109, 125.  The prison did not accommodate

him; rather they sent him to work in the license tag plant and the field.  Tr. Vol. I, at 97,

102-103.

The prison knew of Mr. Hacker's cataracts. *E.g.*, Tr. Vol. I, at 63-65.  It knew the

cataracts were interfering with his daily life activities and could put him in danger.  Tr.

Vol. I, at 113-116, 126-127.  Angola would know about the cataract referral and the

legally blind declaration and his decreased visual acuity by at least May 22, 2013.  Tr.

Vol. I, at 91.  Defendants concede that Mr. Hacker should have been referred for a duty

status review by that point, such that he could have been removed from the fields. Tr.

Vol. I, at 93-94.  Instead he was sent back into the fields and then the license tag plant.

Tr. Vol. I, at 94-95.

To rebut Mr. Hacker's disability, Defendants presented very little evidence. They argued that a letter in Mr. Hacker's handwriting proved he wasn't disabled (PLAINTIFF – 002337), even though Dr. Bell explained that a visually impaired person can often write even when they are significantly disabled. (Mr. Hacker also testified that he spent approximately an hour on the letter – a laborious ~30 seconds per word.) Defendants put on an ophthalmologist, Dr. Kastl, to opine that Mr. Hacker was not legally blind. But on the stand Dr. Kastl admitted he was not provided enough information to support that opinion.[3] Tr. Vol. III, at 174.

    *2.  Defendants failed to accommodate Mr. Hacker's visual impairment.*

Plaintiff presented testimony that Defendants knew about Mr. Hacker's disability and the need for an accommodation through Warden Richard Peabody, the Defendants' ADA Coordinator.  He testified that a reasonable accommodation request can take any form; that Defendant's own policy says this; that the defendants were on notice of Mr. Hacker's need for an accommodation.  *Cf. Robertson v. Las Animas Cnty. Sheriffs Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007); *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006).

Defendants denied his cataracts surgery.  Vol. I, at 129.  Dr. Lavespere conceded that Mr. Hacker's finger was "dismembered" while working in the license tag plant in between the two surgeries on his eyes. Tr. Vol. II, at 65. Evidence was also heard regarding the injury to Mr. Hacker's chest muscle. Plaintiff's Exhibit 105 (Video of Damaged Chest Muscle); Jan 30 at 118, Tr. Vol III at 25, 46, 48, 49, 59 – 61, 68-69. Indeed, Mr. Hacker was not given a no-duty status until after his second cataract surgery, in September 2014.  DEFENDANTS at Page 50.

---

[3] To be legally blind, a person can either have impaired visual acuity (e.g., worse than 20/200) *or* an impaired visual field (*i.e.*, whether you can see out of your whole eye or just a pinhole). Tr. Vol. III at 173. Dr. Kastl admitted on the stand that he had not been provided any information regarding Mr. Hacker's range of visual field (*id.* at 174), and that "visual acuity alone doesn't tell you whether someone is legally blind conclusively." *Id.* at 172.

The latter comes from numerous doctor visits wherein Mr. Hacker was diagnosed with cataracts or told he was legally blind; that he made emergency medical requests while working in the Angola fields; that he wrote letters and an ARP to prison authorities informing them of his need for surgery and a duty status and that his visual impairment was interfering with his ability to participate in various activities in the prison. (Warden Peabody admitted that the proper response would have been to remove Mr. Hacker from the fields and prohibit him from working in dangerous areas like, for example in the license tag plant. Pl's Ex. 15 at 53-54.)

3. *Mr. Hacker was denied access to services, activities and programs that other prisoners without disabilities had access to.*

Mr. Hacker was denied access to a range of services and programs due to the Defendant's failure to accommodate his disability. First, he was denied access to a work assignment appropriate to his physical needs. Warden Peabody conceded at trial that in May 2013 the "proper thing to do" would have been for Jason to go through duty status review, to determine what job was appropriate. Vol. I, at 93-94. But that did not happen. Second, Mr. Hacker was able to use the prison's exercise services when he was fully sighted, but not when he was visually impaired. Vol. I, at 35 ("he started losing a lot of weight and not being able to keep up with his regular diet and exercise and working out . . . he got skinny. Really skinny. He almost looked sickly."); Vol. II, at 75. Third, his disability impaired his ability to participate in the prison's music programs. Vol. II, at 78, 195. Fourth, his disability kept him from participating in the prison's hobbycraft programs. Vol. I, at 43. In fact, the testimony at trial was that Mr. Hacker's entire lifestyle changed due to his disability and his inability to participate in the programs he had while fully sighted. Vol. I, at 45.

Taken together, a great weight of evidence was put before the jury proving an

ADA failure to accommodate violation.  *See Robertson*, 500 F.3d at 1197; *Kiman*, 451

F.3d at 283.  A new trial or JMOL is therefore needed.

**D.      A New Trial is Needed to Remedy the False Testimony Sought by Defendants
and Obtained from Warden Peabody**

A new trial can be granted if "the verdict was based on false testimony." *Bridges*

*v. Enterprise Products Co., Inc.*, 551 F. Supp. 2d 549, 553-554 (S.D. Miss. 2008.)  Here,

Defendants' witness Warden Peabody, the ADA coordinator for Angola, testified that a

temporary impairment is not a disability under the ADA::

> Q.      Now, your testimony also was that the ADA requires that the
> disability has to be permanent; is that right?
> A.      Permanent or longstanding, I don't remember the exact wording.
> Q.      Okay. So it was your testimony that that's what the ADA requires,
> correct?
> A.      Yes.
> Q.      That it must be long-term.
> A.      Yes.
> Q.      That it cannot be episodic.
> A.      Correct.

(Jan 30 at 141 – 142.)

The problem is that everything Warden Peabody said here is false, and has been

for nearly a decade. In 2008, Congress passed the ADA Amendments Act, which "sought

to override *Toyota Motor Manufacturing . . .* in which the Supreme Court had adopted a

strict construction of the term 'disability' and suggested that a temporary impairment

could not qualify as a disability under the Act." *Summers v. Altarum Institute, Corp.*, 740

F. 3d 325, 329 (4th Cir. 2014). Under current law, "episodic" impairments or temporary

impairments lasting less than six months can qualify as disabilities. 42 U.S.C. §

12102(4)(d); 29 C.F.R. § 1630.2(j)(1)(ix).  As the U.S. Department of Justice explains:

> [Q.] Are "temporary" mental or physical impairments covered by title II?
> [A.] Yes, if the impairment substantially limits a major life activity.

*The Americans with Disabilities Act Title II Technical Assistance Manual*, at II-2.4000.[4]

Warden Peabody's statement under oath is therefore flatly incorrect. It is worrisome that Angola's ADA coordinator either perjured himself or does not know what a disability is under current law. But in the context of this case, what is relevant is the very real probability that his statement affected the judgment of the jurors.[5] The jury decided that Mr. Hacker was not disabled, even though they saw evidence that he had been multiply declared "legally blind" by the DOC's own doctors, was declared by an expert to be disabled, and had a wide variety of problems – and two injuries – due to his visual impairment. That conclusion, however, is perfectly logical *if* the jury believed Warden Peabody's false testimony. And it is reasonable that they would have believed him, since his job necessitates a working knowledge of disability law. Plaintiff's only witness who could have spoken knowledgably about the topic to correct the erroneous testimony – Miranda Tait of the Advocacy Center – was strictly limited in the scope of her testimony and could not address the issue.

A new trial is necessary to remove the stain of Warden Peabody's false testimony.

**E.     A New Trial or JMOL is Necessary Because The Jury's Eighth Amendment Verdict Regarding Dangerous Work Is Against the Weight of the Evidence**

Prison officials act with deliberate indifference when they know "that inmates face a substantial risk of serious bodily harm and [disregard] that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F. 3d 339, 346 (5th Cir. 2006). For that reason, prison work requirements constitute an Eighth Amendment violation when prison officials knowingly compel an inmate to perform physical labor which constitutes a danger to their lives or health, or which is unduly painful. *See Ray v. Mabry*, 556 F.2d 881 (8th Cir. 1977), *as cited in Howard v. King*, 707 F.2d 215, 220 (5th Cir.

---

[4] Available online at https://www.ada.gov/taman2.html#II-2.4000.
[5] It also helps explain why Defendants violated Mr. Hacker's rights under the ADA – their own ADA coordinator appears to not understand their obligations under the statute.

1983); *see also Jackson v. Cain*, 864 F. 2d 1235 (5th Cir. 1989) ("If prison officials knowingly put Jackson on a work detail which they knew would significantly aggravate his serious physical ailment such a decision would constitute deliberate indifference to serious medical needs."); *Fruit v. Norris*, 905 F. 2d 1147 (8th Cir. 1990) ("physical labor . . . which constitutes a danger to their health" prohibited by Eighth Amendment).

Here, the jury ruled against Mr. Hacker on his Eighth Amendment claim of dangerous work conditions. But because their verdict is against the great weight of the undisputed evidence, a new trial or JMOL is necessary to ensure justice is done.

Take the period starting in May 2013, when Mr. Hacker was required to work in the fields. Defendants's 30(b)(6) representative, Warden Peabody, acknowledged that depending on the severity of his cataracts, Jason should not have been sent to the fields to work. Tr. Vol. I, at 89-90. And his cataracts were severe: a doctor said Mr. Hacker was "count fingers" in one eye and 20/400 in the other – and noted that "duty status needed." *Id.* at 93. In evidence presented to the jury, Warden Peabody conceded that "if inmates are legally blind to the point where they can't see a certain distance around them, then yes [working in the fields would be "a dangerous thing to do"]" and that such an inmate "should not be in the field." *Id.* at 43, 46. Angola's medical director Dr. Lavespere testified that "you can really hurt yourself . . . out in the field" with impaired vision. Pl.'s Ex. 13 at 56, 61.

At trial, Warden Peabody conceded that the "proper thing to do" at this point would have been for Jason to go through duty status review. Tr. Vol. I, at 93-94. That did not happen. *Id.* at 79. Instead, Mr. Hacker had to work in the fields for several more months, even after being declared legally blind. Joint Stipulations at ¶¶ 17, 19. They then sent him to the kitchen to work, and then to the license tag plant. But Defendants, through Warden Peabody, acknowledged that this was dangerous:

17

Q.      It would be intelligent for them to not put him in the kitchen, correct?
A.      I would think so, yes.
Q.      It would be unintelligent for them to say, go work in the license tag plant, correct?
A.      Yes.
Q.      Because there's heavy machinery there?
A.      Yes.
Q.      And that heavy machinery is used to cut through metal, correct?
A.      Correct.
Q       Not a person – it's not a place for someone with low vision, correct?
A.      Correct.

Tr. Vol. I, at 127 to 128. .  In fact, it was Warden Peabody's testimony that the tag plant would be "much more dangerous" than field work. *Id.* at 135.

To sum up, not only did Defendants require Mr. Hacker to do dangerous work while he was visually impaired, they forced him into a series of *escalatingly dangerous* jobs.

Defendants disputed many factual elements at trial, such as whether Mr. Hacker's visual impairment caused him to cut off his finger in the license place factory. But we need only look at the *undisputed* facts to establish the Eighth Amendment violation. *See supra* and Joint Stipulations at ¶ 11, 16, 17, 18, 19.   Defendants sent Mr. Hacker to work against the recommendation of their own doctors, to do fieldwork that their own staff concedes is dangerous to do with a visual impairment. *See* R. Doc. 170 at 12 (holding that "Additional support for [an Eighth Amendment violation] could be found in one more uncontested fact: LSP required Hacker to do field work, though he was legally blind according to its black-letter files, a decision that could not only be regarded as a danger to his health.") And in case there was any doubt of the exceptional nature of what was done to Mr. Hacker, the expert Dr. Bell testified at trial that in all his decades of work, he was "not aware of another case" in which "a visually impaired person [was] forced to be in as dangerous a situation as Jason Hacker." As a result, new trial or JMOL should issue.

### III.    CONCLUSION

For the reasons above, Plaintiff Jason Hacker requests that this court grant his

motion for judgment as a matter of law or a new trial.

Respectfully submitted,

      */s/ John Adcock*
JOHN ADCOCK
Louisiana Bar No. 30372
P.O. Box 750621
New Orleans, LA 70175
Tel: (504) 233-3125
Fax: (504) 322-3843
Email:  jnadcock@gmail.com

      */s/ William Most*
WILLIAM MOST
La. Bar No. 36914
201 St. Charles Ave., Ste 114 #101
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2017, a copy of Plaintiff's *SUPPLEMENTAL*

*MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL AND RENEWED*

*JUDGMENT AS A MATTER OF LAW* was filed electronically with the Clerk of Court via

the CM/ECF system.  Notice of this filing will be sent to all counsel of record by

operation of the court's electronic filing system.

      */s/William Most*
      William Most